## UNITED STATES *v.* MYERS.

NO. 142.

Argued December 16, 17, 1943.—Decided January 3, 1944.

*Assistant Attorney General Shea,* with whom *Solicitor General Fahy* and *Messrs. Chester T. Lane, J. Frank Staley,* and *Paul A. Sweeney* were on the brief, for the United States.

*Mr. Robert M. Drysdale* for respondents.

MR. JUSTICE REED delivered the opinion of the Court.

These five suits were filed in the Court of Claims by respondents, who are customs inspectors stationed at the Port of Detroit.[1] They have been selected as test cases from a larger number of similar suits. No significant difference in the claims as to services rendered or otherwise is pointed out to us, and we see none. Even the periods for which recovery is sought, September 1, 1931, through August 31, 1937, are identical. We shall therefore state the issues and explain our conclusion in terms of the *Myers* case only, and its determination requires a like result in the other cases.

The precise issue is whether or not the provisions of § 5 of the Act of February 13, 1911, as amended,[2] and §§ 401,

---

[1] Federal Register, August 25, 1937; Code of Federal Regulations, Title 19, Customs Duties, Chap. 1, Bureau of Customs.

[2] 41 Stat. 402, c. 61; 19 U. S. C. 267:

"SEC. 5. That the Secretary of the Treasury shall fix a reasonable rate of extra compensation for overtime services of inspectors, storekeepers, weighers, and other customs officers and employees who may be required to remain on duty between the hours of five o'clock postmeridian and eight o'clock antemeridian, or on Sundays or holidays, to perform services in connection with the lading or unlading of cargo, or the lading of cargo or merchandise for transportation in bond or for exportation in bond or for exportation with benefit of drawback, or in connection with the receiving or delivery of cargo on or from the wharf, or in connection with the unlading, receiving, or examina-

450 and 451 of the Tariff Act of 1930,[3] entitle Mr. Myers to extra compensation over and above his regular salary as customs inspector for night, Sunday and holiday serv-

tion of passengers' baggage, such rates to be fixed on the basis of one-half day's additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o'clock post-meridian (but not to exceed two and one-half days' pay for the full period from five o'clock postmeridian to eight o'clock antemeridian), and two additional days' pay for Sunday or holiday duty. The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted to the collector of customs, who shall pay the same to the several customs officers and employees entitled thereto according to the rates fixed therefor by the Secretary of the Treasury: *Provided,* That such extra compensation shall be paid if such officers or employees have been ordered to report for duty and have so reported, whether the actual lading, unlading, receiving, delivery, or examination takes place or not. Customs officers acting as boarding officers and any customs officer who may be designated for that purpose by the collector of customs are hereby authorized to administer the oath or affirmation herein provided for, and such boarding officers shall be allowed extra compensation for services in boarding vessels at night or on Sundays or holidays at the rates prescribed by the Secretary of the Treasury as herein provided, the said extra compensation to be paid by the master, owner, agent, or consignee of such vessel: *Provided further,* That in those ports where customary working hours are other than those hereinabove mentioned, the Collector of Customs is vested with authority to regulate the hours of customs employees so as to agree with prevailing working hours in said ports, but nothing contained in this proviso shall be construed in any manner to affect or alter the length of a working day for customs employees or the overtime pay herein fixed."

[3] 46 Stat. 708, 715, c. 497, Title IV; 19 U. S. C. 1401, 1450, 1451:

"SEC. 401. MISCELLANEOUS.

"When used in this title or in Part I of Title III—

"(a) Vessel.—The word 'vessel' includes every description of water craft or other contrivance used, or capable of being used, as a means of transportation in water, but does not include aircraft.

"(b) Vehicle.—The word 'vehicle' includes every description of

ices performed during the stated period. Its solution depends upon whether or not, when § 5 speaks of "overtime services," it includes, first, any authorized service rendered

carriage or other contrivance used, or capable of being used, as a means of transportation on land, but does not include aircraft.

.     .     .     .     .

"(f) Day.—The word 'day' means the time from eight o'clock antemeridian to five o'clock postmeridian.

"(g) Night.—The word 'night' means the time from five o'clock postmeridian to eight o'clock antemeridian.

.     .     .     .     .

"SEC. 450. UNLADING ON SUNDAYS, HOLIDAYS, OR AT NIGHT.

"No merchandise, baggage, or passengers arriving in the United States from any foreign port or place, and no bonded merchandise or baggage being transported from one port to another, shall be unladen from the carrying vessel or vehicle on Sunday, a holiday, or at night, except under special license granted by the collector under such regulations as the Secretary of the Treasury may prescribe.

"SEC. 451. SAME—EXTRA COMPENSATION.

"Before any such special license to unlade shall be granted, the master, owner, or agent, of such vessel or vehicle shall be required to give a bond in the penal sum to be fixed by the collector conditioned to indemnify the United States for any loss or liability which might occur or be occasioned by reason of the granting of such special license and to pay the compensation and expenses of the customs officers and employees assigned to duty in connection with such unlading at night or on Sunday or a holiday, in accordance with the provisions of section 5 of the Act entitled 'An Act to provide for the lading or unlading of vessels at night, the preliminary entry of vessels, and for other purposes,' approved February 13, 1911, as amended. . . . At the request of the master, owner, or agent of any vessel, the collector shall assign customs officers and employees to duty at night or on Sunday or a holiday in connection with the entering or clearing of such vessel, or the issuing and recording of its marine documents, bills of sale, mortgages, or other instruments of title, but only if the master, owner, or agent gives a bond in a penal sum to be fixed by the collector, conditioned to pay the compensation and expenses of such customs officers and employees, who shall be entitled to rates of compensation fixed on the same basis and payable in the same manner and upon the same terms and conditions as in the case of customs officers and employees assigned to duty in connection with lading or unlading at night or on Sunday or a holiday."

between 5 o'clock P. M. and 8 o'clock A. M., without regard to whether this service is within the regular hours of his assignment to duty, and, second, Sundays and holidays without regard to the time of day when the authorized services are performed. The Court of Claims entered judgment for claimant for both nighttime and Sunday and holiday services. 99 Ct. Cls. 158.

As the difficulties of applying the statute continually arise at any port where the normal working hours of the customs employees named in the section are not limited to 8 A. M. to 5 P. M. with Sundays and holidays off, we granted certiorari to review the judgment of the Court of Claims. We think the judgment should be reversed as to nighttime services and affirmed as to Sunday and holiday services.

The Port of Detroit possesses a wide variety of transportation facilities which connect it with Canada and which require customs inspection of merchandise, baggage and passengers.[4] Evidently a rotation of assignments of posts and hours among inspectors at Detroit was carried out by the collector. Mr. Myers had either night or Sunday and holiday service or both at all the various posts of duty which are listed in the note. He was paid his annual salary throughout the period. This was a base pay of $2,100, subject to additions and subtractions which were generally applicable to government employees.[5] The claim is for service performed at night-

---

[4] The facilities were listed by the Court of Claims as follows:

> Detroit and Windsor Ferry,
> Walkerville Ferry,
> Detroit and Canada Tunnel,
> Ambassador Bridge,
> Michigan Central Tunnel,
> Wabash Railway Ferries,
> Pere Marquette Railway Ferries,
> Grand Trunk Railway Slip Dock.

[5] E. g., Economy Act of 1932, 47 Stat. 382.

time [6] on weekdays, Sundays and holidays, and in daytime on Sundays and holidays.

At the threshold the Government urges that the statutes heretofore quoted do not create an obligation on the part of the United States to pay the extra compensation which is sought. A carrier may procure customs service at night only by special license, and the statutes say the extra compensation shall be paid "by the licensee" to the collector of customs who shall pay the same "to the inspectors." [7] As the extra compensation here sued for was not collected in whole or part from the carriers concerned, it is urged that the United States is not liable to the plaintiff. [8]

The legislative history shows that the proponents of extra compensation constantly made the point that the Government would not be out of pocket by the legislation. [9] Where the United States stood as a protector of Indians with statutory authority, carefully marked out by a series of enactments, to collect sums for the benefit of

---

[6] Nighttime is defined as the hours between 5 P. M. and 8 A. M., Customs Regulations 1937, Art. 1462; 46 Stat. 708, *supra*, note 3.

[7] See note 3, *supra*. Customs Regulations 1931, Art. 1232, was as follows:

"Art.1232. ACCOUNTING FOR OVERTIME.—(a) Upon receipt of any payments for the services of officers and employees at night or on Sundays or holidays, collectors shall immediately deposit the same in their special deposit accounts and make payment therefrom by check to the officers and employees who rendered the services, and refund in the same manner any funds deposited in excess, these funds to be accounted for in the same manner as other moneys deposited in special deposit accounts."

[8] We doubt whether or not the Government presents this question in its petition for certiorari. As it is the basis of the litigation, however, we resolve that doubt in favor of an adjudicaton of this issue.

[9] Hearings on H. R. 9525, 61st Cong., 2d Sess., pp. 461, 463, 464–465; Hearings on H. R. 6577, 66th Cong., 1st Sess., 13. When the 1920 amendment was under consideration, its sponsor, Senator Calder, said: "the shipowner would pay the collector for it, and then, in turn, the men would be paid by the Government." 59 Cong. Rec. 640.

its dependents, we held that the Government's failure to collect did not give rise to a liability. *Creek Nation* v. *United States*, 318 U. S. 629, 637, 639. In that case we said that authorization to collect did not create a mandatory duty, particularly where the Indians also might have sued. Likewise, under similar circumstances, we have determined that over-collection did not create liability for reimbursement. *United States* v. *Algoma Lumber Co.*, 305 U. S. 415, 418–19, 423. But here the United States is neither protector nor agent. It is an employer who issues orders to the inspectors directing the performance of services. The work is done under the statutes. No inspector may "receive any salary in connection with his services as such an official or employee from any source other than the Government of the United States." Act of March 3, 1917, c. 163, 39 Stat. 1106. These payments are made by the licensees to the collector at rates fixed by the Secretary of the Treasury. This is extra compensation over and above the annual salary, not a payment from licensees. Section 451 requires a bond from the licensee to "pay the compensation and expenses of the customs officers," but the payment must be made to the collector under § 5. These facts lead us to the view that the statutes create an obligation on the part of the United States to pay to inspectors such sums as they may earn under their provisions.[10]

---

[10] The First Deficiency Appropriation Act, fiscal year 1936, 49 Stat. 1636, June 22, 1936, and so within the period covered by this suit, made the appropriation for the Bureau of Customs "available" for payment of these claims. This has been continued, 56 Stat. 150, 155. The Treasury and Post Office Departments Appropriation Act of 1944, Public Law 102, 78th Cong., 1st Sess., c. 179, slip law p. 7, 57 Stat. 250, 256, changed the form of the authorization from making the appropriations available for this payment to a direct appropriation for payment. But see Hearings, Subcommittee of the Committee on Ways and Means (House) on H. R. 6577, 66th Cong., 1st Sess., p. 13.

We come then to an examination of the extent of the obligation under the several sections heretofore quoted in notes 2 and 3. From the earliest days, customs inspections have normally proceeded in daylight. By special license, the work of the customs might be performed at night.[11] Inspectors were on duty continuously and at first were paid on a per diem basis.[12] By the Act of March 3, 1873, R. S. § 2871, the practice of licensees of paying extra compensation for nighttime service [13] (between sunset and sunrise) was formalized by authorizing the collector to fix reasonable extra compensation and to collect and distribute it among the inspectors. The provisions of that section gradually were extended to additional employees and to different circumstances. 23 Stat. 53, 59; 34 Stat. 633. In 1911 further changes were made by an Act for lading and unlading vessels. 36 Stat. 901. Section 5 under examination here emerges there in nearly its present form. Extra compensation for nighttime services was continued and was authorized for the first time for Sundays and holidays.[14] The latest changes were made in

[11] 1 Stat. 665, § 50.

[12] The Government brief furnishes us a convenient summary of the pay legislation: "The pay originally fixed at $2 per diem (Act of March 2, 1799, 1 Stat. 704, 706) was gradually increased to a maximum of $6 in 1909 and $7.80 in 1923 (Act of April 26, 1816, 3 Stat. 306; Rev. Stat. § 2733; Act of April 29, 1864, 13 Stat. 61; Act of March 4, 1909, 35 Stat. 1065, Sec. 2; Act of March 4, 1923, 42 Stat. 1453). By the Act of May 29, 1928, 45 Stat. 955 (19 U. S. C. 6 (a)), customs inspectors were given fixed salaries and paid on annual basis. Compensation of respondents is $2,100 per annum, which may be increased by promotion to a maximum of $3,300. Even prior to 1928, when compensation was changed to an annual basis, customs inspectors, regularly employed and paid on a per diem basis, were paid for 365 days . . . thus receiving the equivalent of an annual salary."

[13] S. Rep. No. 380, 41st Cong., 3d Sess., pp. 42, 139.

[14] Nighttime was apparently administratively determined to be between 6 P. M. and 7 A. M., 59 Cong. Rec. 2171; Hearings before the Committee on Ways and Means, House of Representatives (75th

§ 5 in 1920. "Night" services became "overtime" services. Sundays and holidays were placed at the beginning of the section in juxtaposition with "hours" which were fixed at from 8 A. M. to 5 P. M. The last proviso vesting authority in the Collector of Customs to regulate the hours of employees "so as to agree with prevailing working hours in the ports" was added.[15] The tariff Act of 1922, §§ 401, 450 and 451, extended the provisions of § 5 of the lading and unlading act so as to cover passengers and baggage arriving by vehicle. These sections as they now appear in the Tariff Act of 1930 are in note 3, *supra.*

The Collector of Customs at Detroit, during the years in question, assigned inspectors to tours of duty of eight hours each day, which tours might be at any time within a twenty-four hour period.[16] The length of the weekly tour varied with the post and with the state of the federal legislation. The findings of the Court of Claims as to the actual results are set out in the note below.[17] In the

Cong., 1st Sess.), on H. R. 6738 (one of the bills which became the Customs Administration Act of 1938), amending § 451 of the Tariff Act of 1930 (Act of June 25, 1938, c. 679, § 9, 52 Stat. 1082), p. 185.

[15] See note 2 and for a graphic explanation of the changes, see *International Ry. Co.* v. *Davidson,* 257 U. S. 506, 510.

[16] This was settled practice. *International Ry. Co.* v. *Davidson,* 257 U. S. 506, 508.

[17] "4. As used in these findings the word 'nighttime' refers to the period 5 o'clock p. m. of any day to 8 o'clock a. m. of the next day, and the word 'daytime' to the period 8 o'clock a. m. of any day to 5 o'clock p. m. of the same day. 'Excess pay' refers to pay in excess of the inspector's annual salary. The word 'week-day' refers to any day of the week other than Sundays or whole holidays, and the word 'holiday' refers to a holiday of not less than 24 hours.

"5. Before the opening of the Ambassador Bridge November 15, 1929, all customs inspectors at the port of Detroit were regularly assigned to eight-hour tours of duty, which might be any period of that length within the 24 hours of any day of the week, including Sundays and holidays. They did not receive for nighttime services performed on such tours weekdays, Sundays, or holidays, any excess pay, but they did receive excess pay for daytime service so performed

administration of customs, regulations based on the sections of the Tariff Act of 1930 and § 5 of the Act of 1911 were issued by the Treasury Department. Customs Reg-

on Sundays or holidays. The inspectors had an eight-hour day and a 56-hour week.

"This practice, however, did not wholly prevail at the Michigan Central Railway, where for certain periods prior to November 15, 1929, excess pay was not allowed for daytime service on Sundays or holidays.

"6. Upon the opening of the Ambassador Bridge November 15, 1929, there was a change in practice at the port of Detroit.

"At the Detroit and Windsor Ferry, the Walkerville Ferry, the Detroit and Canada Tunnel, the Ambassador Bridge, and the freight yard of the Michigan Central Railway, the customs inspectors were given an eight-hour day and a 48-hour week.

"Excess pay was discontinued for daytime service performed on Sundays or holidays, within the 48-hour week. No excess pay was given for nighttime service performed Sundays, holidays, or weekdays, within the 48-hour week.

"At the Michigan Central Railway passenger station and the Wabash Railway and Pere Marquette Railway ferries, and the Grand Trunk Railway Slip Dock the hours continued as before, with an eight-hour day and a 56-hour week. Excess pay was continued at these last four places for daytime service performed on Sundays and holidays, even though within the 56-hour limit, but no excess pay was given for nighttime service there on Sundays, holidays, or weekdays, performed within the 56-hour period.

"After March 3, 1931, the date of going into effect of the Saturday half-holiday for Federal employees, the hours of employment per week were reduced to 44 at the Detroit and Windsor Ferry, the Walkerville Ferry, the Detroit and Canada Tunnel, the Ambassador Bridge and the freight yard of the Michigan Central Railway, and to 52 hours per week at the passenger station of the Michigan Central Railway, at the Wabash Railway and Pere Marquette Railway ferries, and at the Grand Trunk Railway Slip Dock, with conditions of excess pay as before but within and based upon the new period of 44 hours. Pay in excess of their annual salaries was given to inspectors for time served in excess of 44 hours per week at the passenger station of the Michigan Central Railway, at the Wabash Railway and Pere Marquette Railway ferries and at the Grand Trunk Railway Slip Dock notwithstanding the 52-hour week."

ulations 1931 and 1937. So far as here pertinent they are substantially alike.[18]

The legislative history of the various acts makes clear the intention of Congress to allow extra compensation only when there are overtime services in the sense of work hours in addition to the regular daily tour of duty without regard to the period within the twenty-four hours when the regular daily tour is performed. Congressman Moore

---

[18] The references are to the 1937 editions:

"Art. 1242. *Extra compensation.*—(a) Customs officers and employees performing services at night, or on Sundays and holidays, for lading or unlading of cargo or merchandise . . . shall receive extra compensation, to be paid by the master, owner, or agent of the vessel, or by the transportation company. . . ."

"(e) The extra compensation for overtime services is in addition to the regular compensation paid by the Government in the case of officers and employees whose compensation is fixed on the ordinary per diem basis and those receiving a compensation per month or per annum."

"Art. 1462. *Hours of service.*—(a) The official hours of officers, clerks, examiners, and employees, except those hereinafter specified, will be from 9 a. m. to 4:30 p. m., with a half hour for lunch.

"(b) The official hours of the following employees will be: Staff officers, station inspectors, and inspectors to whatever duty assigned, sugar samplers, samplers, laborers, storekeepers, and outside messengers, from 8 a. m. to 5 p. m., 1 hour for lunch; verifiers-openers-packers and openers and packers, 8 a. m. to 4:30 p. m., one-half hour for lunch; customs guards not less than 8 hours.

"(c) The above hours may be extended as the needs of the service demand, and such extension shall be without additional compensation, except as provided for in the act of February 13, 1911, as amended by the act of February 7, 1920.

"(d) The act of February 7, 1920, also provides that in those ports where customary working hours are other than those above mentioned, the collector of customs is vested with authority to regulate the hours of customs employees so as to agree with prevailing working hours in said port, but nothing contained in this proviso shall be construed in any manner to affect or alter the length of a working-day for customs employees or the overtime pay fixed for such employees. . . ."

explained the purpose as follows (Hearings on H. R. 9525, 61st Cong., 2d Sess., at p. 470): [19]

"Mr. Fordney. The compensation for night work would be more than twice the compensation for day work?

"Mr. Moore. I think not, but so long as a man works in the daytime and then continues his work through the night, if the expense does not come out of the Government he should be paid double."

At the hearings, just prior to the 1920 amendment to § 5, the understanding apparently was that extra compensation would begin only after a day's work of ten or eleven hours. The pay of an inspector was per diem and was paid for each day in the year. The Treasury Department wrote to the Chairman:

"The department has under consideration a plan whereby boarding officers and inspectors of customs will be assigned to duty in eight-hour shifts and will not, therefore, be called upon to work overtime and no extra compensation paid to officers assigned to the night shift. In order to carry out such plan it will be necessary to secure additional appropriations, and pending the adoption of the plan it will, of course, be necessary to detail inspectors and other employees for night work." [20]

There are other references in the hearings to the use of the "shift" system to secure twenty-four hour service without extra compensation. The legal basis for a collector's authority to assign inspectors in this way is the last proviso of § 5, note 2, *supra*. It gives the collector authority in those ports where customary working hours are other than 8 A. M. to 5 P. M. to regulate the hours

---

[19] This quotation is from hearings May 5, 1910, on a bill similar to the one which became the Act of February 13, 1911. Hearings before House Com. on Ways and Means, on H. R. 9525, 61st Cong., 2d Sess.

[20] Hearings before a subcommittee of the Committee on Ways and Means (House) on H. R. 6577, 66th Cong., 1st Sess., October 11, 1919, pp. 1–19, particularly p. 11.

of inspectors so as to agree with prevailing working hours in the ports. In speaking of the provision after its adoption, an official of the Customs Inspectors Association said at a hearing on an immigration inspectors bill (Hearings on S. 1504, S. 1774 and S. 2188, 67th Cong., 1st and 2d Sess., p. 130):

"To meet the condition at New Orleans, where the hours of labor are from 7 o'clock a. m. to 4 o'clock p. m., this proviso at the end of the bill was put in allowing collectors to adjust the inspectors' hours to the customary working hours at ports where the practices are different. This proviso also applies to the Canadian border at places where traffic is continuous during the 24 hours, such being the 'customary working hours'—and the inspectors work in 8–hour shifts without overtime." [21]

When we examine the language of § 5, either without extrinsic aid or with the benefit of the historical and legislative background, we find convincing authority to support the Government's view as to the meaning of overtime. "Overtime" as we pointed out above was substituted by the 1920 amendment of § 5 for "nighttime" services. The section requires employees to "remain" on duty. The usual instance of the payment of extra compensation would be for work after 5 P. M. by an inspector who had previously worked full time. The Government is correct in its interpretation of the last proviso of § 5 as permitting shifts in an inspector's regular hours of work. Night assignments are an old administrative practice. It is true that the proviso apparently was passed to meet a New Orleans situation but the language is general. It does not restrict the collector to minor variations in hours. We are led to the conclusion that overtime, as applied to week days, refers to hours longer than the daily limit of 8 A. M. to 5 P. M., nine hours with one

[21] See also Hearings, Senate Committee on Finance, 71st Cong., 1st Sess., on H. R. 2667, p. 494.

hour for food and rest. Furthermore, these tours of duty under the proviso are movable within the twenty-four hour period in accordance with prevailing working hours and the requirements of the service.

We do not see that *International Ry. Co.* v. *Davidson,* 257 U. S. 506, decides otherwise. That was a suit to enjoin the Collector from enforcing the license provisions of § 5, note 2, *supra,* as to passengers and baggage, against an international bridge. These were held inapplicable to bridges. In speaking of § 5, the opinion stated: "This substituted section defines what shall be deemed overtime, how the rate of extra pay shall be fixed, and what the work is, for which extra compensation shall be paid." It did not, however, interpret the statute or consider the proviso both of which we are called upon to do here. *Contra,* see *Ferguson* v. *Port Huron & Sarnia Ferry Co.,* 13 F. 2d 489, 492.

As to Sundays and holidays, we construe the statute to require extra compensation for inspectors without regard to the hours of the day or whether such services are additional to a regular weekly tour of duty. Before § 5 there was no authority to pay extra compensation for Sunday and holiday work. Revised Statutes, § 2871, allowed extra pay for nighttime work only. Somewhat indirectly the Act of February 13, 1911, gave Sunday and holiday pay and the 1920 amendment made the right to that extra compensation clear by saying extra compensation shall be paid inspectors "who may be required to remain on duty between the hours of five o'clock postmeridan and eight o'clock antemeridian, or on Sundays or holidays." This language and the Customs Regulations, note 18, *supra,* give an employee who works regular hours weekdays in daytime extra pay for Sunday and holiday work. The statute covers also those who work outside the statutory normal hours. Logically, if Sundays and holidays were not to receive extra compensation, without regard to whether services on those days were over-

time, there would have been no occasion to add Sundays and holidays to the overtime. Overtime would cover every situation.

The proviso of § 5 does not give the Collector of Customs authority to make assignments which deprive inspectors of this Sunday and holiday pay. It authorizes adjustments of hours but specifically forbids alteration of overtime pay. It is silent as to Sundays and holidays which leaves the earlier grant of extra compensation for those days in effect. Overtime pay is also applicable to Sundays and holidays when inspectors work longer than nine hours with one hour for food and rest. The rate of overtime extra compensation on Sundays and holidays is the same as the rate for week days. The administrative practice is uncertain. It does not support a contrary conclusion. The Government cites excerpts from testimony on amendatory bills, not here directly involved, which indicate the extra compensation is paid for Sundays and holidays.[22] Findings 5 and 6 of the Court of Claims, note 17, *supra,* show that extra compensation was paid at times for Sunday and holiday services.[23]

Two further contentions of the Government require consideration. It is said that § 5 of the 1911 Act as

[22] Hearings on S. 1504, S. 1774 and S. 2188, Committee on Commerce (Senate), 67th Cong., 1st and 2d Sess., pp. 30, 31 and 130.

[23] See T. D. 49658, approved July 18, 1938, after the period here in question, where Art. 1242 (g) is amended to read as follows:

"(g) Extra compensation is not authorized for any service performed by a customs officer or employee pursuant to his assignment to a regular tour of duty at night or on a Sunday or holiday."

There are similar overtime acts in other services. They allow Sundays and holidays extra. Cf. 46 Stat. 1467, and U. S. Dept. of Labor, Bureau of Immigration General Order No. 175, April 27, 1931, (d); 49 Stat. 1380 and Dept. of Commerce Circular No. 307, December 17, 1938; Bureau of Marine Inspection and Navigation, II; 48 Stat. 1064, as amended, and Federal Communications Commission Rules and Regulations, Part 8, § 8.301 (i).

amended does not apply to services rendered at a bridge or tunnel. This Court so held in 1922. *International Ry. Co.* v. *Davidson,* 257 U. S. 506, 512. At that time, the section's application was limited to "vessel or other conveyance." Since then §§ 401, 450 and 451 of the Tariff Act of 1922, 42 Stat. 858, 948, 954, and of the Tariff Act of 1930, note 3, *supra,* have expanded the instrumentalities to include every contrivance capable of being used as a means of transportation on land or water.[24] The difference in definition, we think, brings bridges and tunnels under the overtime pay requirements of § 5.

Finally the Government urges that in awarding compensation for "overtime" services credit should be allowed to it for that part of the base pay received for such services. We think the Congressional intention to give extra compensation precludes such a claim. The inspectors in addition to their regular salaries for week days are entitled to the statutory additional pay for overtime, Sundays and holidays.

The judgment of the Court of Claims is reversed and the proceeding remanded to that Court for determination of the claim of the inspectors in accordance with this opinion.

*Reversed.*

MR. CHIEF JUSTICE STONE is of the opinion that the judgment should be reversed in its entirety and the suits dismissed.

[The foregoing opinion of the Court is printed as amended by an order of February 28, 1944, *United States* v. *Myers,* 321 U. S.]

---

[24] See also § 9 of the Customs Administration Act of 1938.

The change was deemed significant as to railroads. Compare *Mellon* v. *Minneapolis, St. P. & S. S. M. Ry. Co.,* 285 F. 980, with *Mellon* v. *Minneapolis, St. P. & S. S. M. Ry. Co.,* 11 F. 2d 332, 334.