Horace E. WILEY, George M. Tellefsen, Mary E. Foltz, Administratrix of the Estate of Charles Austin Foltz, Deceased,

v.

The UNITED STATES.

Richard Harry BRONDYKE

v.

The UNITED STATES.

Nos. 49879, 173-53.

United States Court of Claims.

Nov. 7, 1956.

Louis M. Hopping, Detroit, Mich., for plaintiffs.

Arthur E. Fay, Washington, D. C., with whom was Asst. Atty. Gen., George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

1. As used herein the terms "plaintiff" or "plaintiffs" refer to the immigration officer or officers who performed the services and who were the original claimants in these actions.

2. Plaintiff Brondyke's petition was filed on April 29, 1953, and this date has been used accordingly as a cutoff. Since

PER CURIAM.

These cases were referred by the court pursuant to Rule 45(c), 28 U.S.C.A., to the Honorable W. Ney Evans, a commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed April 5, 1956. The court agrees with and adopts the findings, recommendation, and opinion of the commissioner as hereinafter set forth as the basis of its judgment in this case.

Each of the plaintiffs is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).

It is so ordered.

Findings of Fact

1. Each of the plaintiffs [1] seeks to recover extra compensation pursuant to statute for services performed as an officer of the Immigration Service of the United States at the ports, in the capacities, and during the periods listed below:

Brondyke, Richard H.: Detroit, Officer in Charge, Detroit-Canada Tunnel, April 15, 1947 to September 1947, and Chief of Deportations, September 1947 to September 1949; Port Huron, Assistant Officer in Charge, September 1949 to April 29, 1953.[2]

Foltz, Charles A.: Niagara Falls, Officer in Charge, May 1, 1946 to October 23, 1950.[3]

Kirk, Frederick W.: Buffalo, Assistant Chief, Entry and Departure Section, November 2, 1947 to August 12, 1948; Niagara Falls, Assistant Officer in Charge, August 13, 1948 to October 23, 1950.

March 1954, he has been Assistant Chief, Entry and Departure Section, Detroit.

3. The petition in behalf of plaintiffs Foltz, Kirk, Tellefsen, and Wiley was filed on October 23, 1950, and the parties used this as the cut-off date in their requested findings of fact.

Tellefsen, George M.: Detroit, Assistant Chief, Entry and Departure Section, July 14, 1946 to October 23, 1950.

Wiley, Horace E.: Detroit, Chief, Entry and Departure Section, May 6, 1946 to October 23, 1950.

2. The act of March 2, 1931,[4] directed the Secretary of Labor [5] to " * * * fix a reasonable rate of extra compensation for overtime services of inspectors [6] and employees of the Immigration Service [7] who may be required to remain on duty * * * on Sundays or holidays, to perform duties in connection with the examination and landing * * * " of persons " * * * arriving in the United States from a foreign port * * *, such rates to be fixed on a basis of * * * two additional days' pay for Sunday and holiday duty; * * *."

3. At all times material to these actions the following operation instruction was in effect in the Immigration and Naturalization Service:[8]

" * * * Officers in charge and other supervisory officers who supervise primary inspectors doing inspection work for which overtime is paid under the 1931 Act but who perform none of that inspection work themselves shall not receive overtime pay under that act.

" * * * Except in emergencies officers in charge and other supervisory officers who ordinarily do not perform regular tours of duty as primary inspectors shall not be assigned to or perform inspection work for which overtime is paid under the 1931 Act.

4. (a) Each of the plaintiffs was an "officer in charge or other supervisory officer" within the meaning of the operation instruction set forth in the preceding finding.

(b) As an "officer in charge or other supervisory officer" each of the plaintiffs performed some services on Sundays and holidays during the periods of their respective claims.[9]

(c) Each of the plaintiffs has received his base salary for all periods in suit, plus certain extra compensation payable under provisions other than the 1931 act. None has received compensation under the 1931 act for Sunday or holiday services. Each plaintiff claims the difference between the amount payable under the 1931 act for Sunday and holiday services and the amount he has received.

5. As an "officer in charge or other supervisory officer" each of the plaintiffs was charged with administrative and supervisory responsibilities in the conduct and management of the office out of which the primary inspectors worked.[10] In each instance, this office was at or near the site of the primary inspectors' work.

The supervisory officers planned work schedules, including the assignments of primary inspectors, handled correspond-

---

4. 46 Stat. 1467, 5 U.S.C.A. §§ 342c, 342d.

5. Reorganization Plan No. V of 1940, 54 Stat. 1238, placed the Service in the Department of Justice, resulting in the substitution of the Attorney General for the Secretary of Labor in subsequent codifications of the statute. 5 U.S.C.A. §§ 342c and 342d.

6. The Act of June 27, 1952, 66 Stat. 278, substituted the words "immigration officers" for the word "inspectors."

7. Executive Order No. 6166, of June 10, 1933, changed the name of the agency to the Immigration and Naturalization Service.

8. The original effective date of the operation instruction is not in evidence.

9. There is no contention that any of the plaintiffs performed emergency services during these Sunday and holiday tours sufficient to qualify under the operation instruction for the statutory extra compensation on the basis of services as primary inspectors.

10. There were 62 primary inspectors working under the supervision of plaintiff Wiley. Plaintiff Tellefsen had supervision of the same 62 primary inspectors during 54 percent of his time on duty. Plaintiffs Foltz and Kirk were responsible for the supervision, respectively, of 41 and 40 primary inspectors.

ence, supervised records, and generally managed the offices.

In addition to these duties, they were charged with certain supervisory responsibilities in connection with the work of the primary inspectors. It was these responsibilities which made it necessary for a supervisory official to be on duty with the primary inspectors on Sundays and holidays.[11]

For example, a primary inspector could, and under certain circumstances was required to refer to the officer in charge the decision as to whether to admit, and if so, upon what terms, certain aliens as to whose status the primary inspector was not quite certain, such as applicants who might become public charges, or who had physical disabilities, or unaccompanied children, students, visitors, et cetera. In such cases the officer in charge was authorized, within specified limits, to admit the alien as upon "primary inspection", without referring the applicant to a special board of inquiry.

### Opinion of the Commissioner

The only question in these cases is whether or not the supervisory officers in immediate charge of the primary inspectors of the Immigration Service " * * * perform duties in connection with the examination and landing * * *" of persons " * * * arriving in the United States from a foreign port * * *," within the meaning of the act of March 2, 1931, 46 Stat. 1467.

Plaintiffs contend that they did perform such duties because they were called upon to make many of the more important decisions arising in the course of the primary inspections.

In their brief plaintiffs have not raised the question of what extent, if any, the requisite immediate supervision of the work of the primary inspectors is itself a part of the primary inspection. They

rely instead upon their direct participation in the primary inspections as qualifying them for inclusion in the benefits of the act.

Defendant maintains that the purpose of the 1931 act was to provide extra compensation for the primary inspectors only. In support of this position defendant relies upon that portion of the legislative history of the 1931 act which shows that the Immigration Service asked for the legislation primarily because customs inspectors were receiving extra compensation under the act of February 13, 1911,[12] as amended,[13] while immigrant inspectors who worked side by side with them were not so paid.

By means of an "operation instruction" which was in effect during the periods for which these plaintiffs claim, the Immigration Service excluded the supervisory officers from the benefits of the 1931 act on the analogy of the well-known distinction between operating employees and managerial staff. The supervisory officers were thus assigned to a category separate and distinct from that of the primary inspectors because the supervisory duties made the officers in charge comparable to superintendents and foremen.

Plaintiffs do not contend that the duties they performed during the periods of their claims were the duties of primary inspectors, or that they were on emergency assignments within the meaning of the operation instruction. They do contend that they were "inspectors" within the meaning of the act, and defendant does not seriously challenge their position in this regard.

The only question, therefore, is whether they performed "duties in connection with the examination and landing" of persons, within the meaning of the act.

In the cases of Greene v. United States and Toney v. United States, 1951, 94 F. Supp. 666, 118 Ct.Cl. 248, the court con-

---

11. Plaintiffs Wiley and Tellefsen, Chief and Assistant Chief, Entry and Departure Section, Detroit, each worked a five-day week, so arranged as to require one or the other to be on duty on every Sunday or holiday.

12. 36 Stat. 901.

13. See 19 U.S.C. § 267.

cluded that members of the Immigration Border Patrol performed duties in connection with the examination and landing of persons seeking entry, but that they were not entitled to the benefits of the 1931 act for two reasons: (1) because the provisions of the act relate only to duties performed at ports of entry, whereas the border patrol operated between such ports; and (2) because the provisions of the act were intended for the benefit of the owner of the vessel or other conveyance on which the immigrants arrived, and the services of the border patrol were not so performed.

The court's conclusion in the Greene and Toney cases that members of the border patrol performed duties in connection with the examination and landing of persons seeking entry supports the contention of plaintiffs that they, too, performed such duties. Moreover, these plaintiffs performed their duties at ports of entry.

It does not appear from the evidence, however, that the present plaintiffs performed their services "for the benefit of the owner of the vessel or other conveyance" within the meaning of the Greene and Toney decision; and this fact requires some further examination of the 1931 act and of the conditions under which plaintiffs' services were performed.

The material portions of section 1 of the 1931 act are set forth in finding 2, above. They provide, in effect, for the payment of two additional days' pay as extra compensation for Sunday or holiday duty. The text of section 2 of the act follows:

"Sec. 2. The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance arriving in the United States from a foreign port to the Secretary of Labor, who shall pay the same to the several immigration officers and employees entitled thereto as provided in this Act. Such extra compensation shall be paid if such officers or employees have been ordered to report for duty and have so reported, whether the actual inspection or examination of passengers or crew takes place or not: Provided, That this section shall not apply to the inspection at designated ports of entry of passengers arriving by international ferries, bridges, or tunnels, or by aircraft, railroad trains, or vessels on the Great Lakes and connecting waterways, when operating on regular schedules."

The evidence in these cases is silent as to any designation of ports by the Immigration Service. It is apparent from the evidence, however, that all of the ports at which plaintiffs worked were ports which could have been designated. Moreover, from the facts upon which the parties agreed in the original test cases[14] of the 1931 act, Renner v. United States and Krupp v. United States, 1946, 106 Ct.Cl. 676, it must be surmised that the port of Detroit had been so designated.[15]

Under the circumstances, and in the absence of any issue raised by the parties relating to the point, it must be concluded that the absence of evidence connecting the services of these plaintiffs with "the convenience of the master or

---

14. " * * * in order to reach a just result and bring an end to litigation, courts will * * * use * * * uncontroverted facts [which are] not formally of record in * * * pending litigation [but which are ascertainable] from * * * examination of * * * facts and pleadings in former cases in * * * appellate court[s] between at least one of the parties and others relating to * * * same subject matter." A. G. Reeves Steel Const. Co. v. Weiss, 6 Cir., 1941, 119 F.2d 472, 474. The same rule is ap-

plicable to trial courts. Ellis v. Cates, 4 Cir., 1949, 178 F.2d 791.

15. The court's special findings of fact in the Renner and Krupp cases were predicated on a statement of facts upon which the parties had agreed. Portions of the findings contain such phraseology as "ferries operating on the Great Lakes or connecting waterways on regular schedules" and other expressions which appear in the 1931 act only in the proviso clause at the end of section 2.

owner of the vessel" is of no consequence in this instance.

Comparison of the act of 1911, under which customs inspectors were paid extra compensation, with the 1931 act for the benefit of immigrant inspectors, reveals a marked similarity of language until the proviso clause of section 2 of the 1931 act is reached. When the 1931 act was adopted, there was no counterpart of the proviso clause in the 1911 act. Why, then, was it inserted in the 1931 act?

Here, again, since neither of the parties has offered evidence on the point or touched upon it in their briefs, it is necessary to draw upon other cases involving these two statutes.

The history of the Myers case (United States v. Myers), 1944, 320 U.S. 561, 64 S.Ct. 337, 88 L.Ed. 312, and the actions of the Bureau of Customs in adapting regulations to the requirements of the decision show quite clearly that, prior to Myers, the Bureau of Customs made no payments of extra compensation under the act of 1911 unless and until arrangements had been made to collect the extra compensation from the licensees. The claimants in Myers proceeded on the contention, which Customs resisted, that payment of the extra compensation was an obligation of the United States, as the employer, regardless of the failure of the Collector of Customs to arrange for or to obtain reimbursement.

The Bureau of Customs made no payments of non-reimbursable extra compensation prior to 1944, in the belief that it was without authority to do so. On the other hand, the proviso clause in the 1931 act clearly authorized the Immigration Service to pay the extra compensation without reimbursement for

"* * * inspection at designated ports of entry of passengers arriving by international ferries, bridges, or tunnels, or by aircraft, railroad trains, or vessels on the Great Lakes and connecting waterways, when operating on regular schedules."

It must be inferred that the Immigration Service (or the Committees of Congress) anticipated, when the 1931 act was drawn, the very kind of confusion the Bureau of Customs later encountered, and made advance provision for it.

During the years 1945–1955, hundreds of claims filed in this court by inspectors of the Customs and Immigration Services have been concluded by judgments stipulated on the authority of a handful of test cases.[16] Thirty additional cases, all involving customs inspectors, are now pending before the court on the commissioner's findings of fact and recommendation for conclusion of law.[17]

Comparison of the decided (test) cases involving customs inspectors with those involving immigrant inspectors, and reference to the customs inspectors' cases now pending, indicate that, except for the variant approach by the Immigration Service to the problem of obtaining reimbursement of extra compensation from transportation facilities on the Canadian border, both the Immigration Service and the Bureau of Customs have consistently limited the payment of extra compensation under their respective statutes wherever possible to conserve their own appropriations.

From this fact it may be inferred that the Immigration Service has, from the inception of the 1931 act, followed rather closely the pattern established by the Bureau of Customs, making provision for the payment of extra compensation only

16. In addition to Myers, Renner and Krupp, and Greene and Toney, cited above, the test cases include: (1) as to customs inspectors, O'Rourke v. United States, 1947, 109 Ct.Cl. 33; Brown v. United States, 1947, 109 Ct. Cl. 52; and Ostroot v. United States, 1947, 109 Ct.Cl. 57; and (2) as to immigrant inspectors, Gibney v. United States, 1949, 114 Ct.Cl. 38; Taylor v. United States, 1949, 114 Ct.Cl. 59; and Ahearn v. United States, 1949, 114 Ct.Cl. 65.

17. See the Recommendation by the Commissioner, filed January 16, 1956, in the groupings of Handly (No. 45839), Schaible (No. 46945), and Sanderson (No. 46764).

to those immigrant inspectors who worked side by side with the customs inspectors for whom similar provision had been made by the Customs Bureau.

The acceptance of this inference as fact, however, serves only to beg the question at issue, since there is no evidence in the record of the instant cases to show that the Bureau of Customs ever limited the payment of extra compensation to those doing the work of primary inspection, or that such payment was denied to other employees, supervisory or not, whose work was "in connection with" the primary inspection. Turning again to other cases involving the customs statute, it is apparent that the Bureau of Customs did not exclude supervisory officers from the benefits of the act simply because they were supervisory officers. The claimants in the O'Rourke and Brown cases were Deputy Collectors of Customs. On the other hand, no point was made in those cases of the claimants' supervisory duties. Ostensibly, the work they did was the work of a customs inspector engaged in primary inspection.

In the absence of facts relating to the Bureau of Customs' treatment of supervisory officers performing supervisory duties, defendant's contention that the Immigration Service understood and construed the 1931 act to be restricted to primary inspectors because the Customs statute was similarly restricted is seriously lacking in support. Because of this, defendant's further contention that "the uniform interpretation of the language * * * by the agency which urged passage of the 1931 Act and is charged with the administration thereof is entitled to great weight", citing Kern River Co. v. United States, 1921, 257 U.S. 147, 154, 42 S.Ct. 60, 66 L.Ed. 175, becomes largely inapposite.

Inquiry remains to be made as to whether, as defendant contends, the legislative history of the 1931 act reveals a clear intent on the part of Congress to provide the extra compensation for primary inspectors only.

As heretofore noted, defendant's brief relies heavily upon the legislative history of the 1931 act (as contained in remarks on the floor of the House of Representatives by a sponsor of the bill, and in the reports of the Senate and House Committees, including communications from the Secretary of Labor and the Commissioner General of Immigration) to show that the purpose of the 1931 act was to provide extra compensation for inspectors of the Immigration Service on the same terms and to the same extent as extra compensation was paid to inspectors of the Customs Service, because the two sets of inspectors served the same vessels at the same ports, usually working side by side.

The Senate report, which incorporated and reproduced the House report, is attached to defendant's brief. There is no question of the accuracy of defendant's references, or of the emphasis reflected therein for " * * * granting overtime to immigration inspectors in line with overtime now being paid customs inspectors who do similar work."

Only one passage in the legislative history cited by defendant appears plainly to have been addressed to a distinction between immigration officers performing different duties, and it was contained in a letter addressed to the Chairman of the Committee on Immigration and Naturalization of the House of Representatives by the Secretary of Labor on January 2, 1923, more than eight years before the statute was passed. Following is the pertinent excerpt from that letter:

"* * * It has been suggested that the adoption of this legislation might result in discrimination in favor of boarding officers and those engaged in train work as compared with officers who are sometimes compelled to work overtime at the immigration stations. I do not believe this is a valid objection, however, for the reason that hours of work at the stations can, as a rule, be controlled, while, as already pointed out, the work of boarding and train officers at times is subject to the movement of steamships and trains. * * * "

Defendant's brief suggests that the Secretary of Labor was thereby making a distinction between boarding and train officers as primary inspectors, on the one hand, and officers working at immigration stations as supervisory officers on the other. Such a distinction may well be a *non sequitur*, in the light of the very next paragraph of the Secretary's letter, which follows:

"* * * However, the most unsatisfactory phase is the existing discrimination which results from the law under which customs officials are reimbursed for overtime work by the transportation companies, while our own officers who are obliged to perform similar work under the same conditions receive no compensation for their overtime labor."

Reducing the Secretary's letter to a compact paraphrase, the theme of it appears to have been as follows: Congress has already authorized customs inspectors to receive extra compensation for overtime from the steamship companies, and the companies are entirely willing to pay it. As long as the customs inspectors are thus paid for overtime, the immigrant inspectors are entitled to be paid also. The unfairness of paying one group and not the other is obvious, and our boarding officers at New York, Seattle, and San Francisco have complained of the discrimination. Objection to paying the boarding and train officers because of possible discrimination against station officers, who also sometimes have to work overtime, is not valid because the hours of work at the stations can as a rule be controlled, whereas the work of boarding and train officers is subject to the movement of steamships and trains. In any event, the most unsatisfactory phase of the existing situation is that our officers work side by side with customs officers who get paid for overtime by the transportation companies while our officers are not so paid.

On the whole, it appears more logical to conclude that the Secretary of Labor intended to draw a distinction between two sets of primary inspectors, rather than between primary inspectors and supervisory officers. He must have known that the Bureau of Customs collected the extra compensation from steamship and railroad companies, and that it did not collect from ferries, bridges, and tunnels. He certainly knew that the immigration officers who boarded ships and trains in company with customs officers who got paid for overtime were unhappy over their failure to receive similar pay. In distinguishing between these boarding officers and officers working at stations, he may well have had in mind as the officers working at stations the primary inspectors who worked at the stations serving ferries, bridges, and tunnels. The customs inspectors who worked with these immigrant inspectors did not receive overtime pay.

The foregoing rationalization has the further merit of providing a logical explanation for the insertion of the proviso clause in section 2 of the 1931 act.

The legislative history of the 1931 act does not show an intention on the part of the Immigration Service to ask or of the Congress to provide statutory authority for the payment of extra compensation for overtime and Sunday and holiday work subject to restriction that the payments be made only to primary inspectors to the exclusion of supervisory officers. By the same token the legislative history does not show an express intention on the part of the Immigration Service to ask or of the Congress to provide statutory authority covering the supervisory officers.

Referring then to the language of the statute, it was, as heretofore noted, broad enough to include the supervisory officers in the phrase "inspectors and employees". The plaintiffs in these cases did, as has also been noted previously, "* * * perform duties in connection with the examination and landing * * *" of persons "* * * arriving in the United States from a foreign port * * *." Finally, this court has consistently held that payment of the extra compensation authorized by the

statute is mandatory upon the agencies (the Immigration Service and the Bureau of Customs), and that the payment must be made in the amounts specified to those officers and employees who meet the statutory specifications of hours worked, tours of duty, and services performed. The present plaintiffs met the statutory specifications during the periods of their claims.

Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that each of the plaintiffs is entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.