**NATIONAL TREASURY EMPLOYEES UNION, Appellant,**

v.

**George J. WEISE, Commissioner, United States Customs Service, Appellee.**

No. 95–5149.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 30, 1996.

Decided Nov. 19, 1996.

Elaine D. Kaplan argued the cause for appellant. With her on the briefs was Gregory O'Duden. Clinton D. Wolcott entered an appearance.

Fred E. Haynes, Assistant United States Attorney, argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., United States Attorney, R. Craig Lawrence and Michael J. Ryan, Assistant United States Attorneys.

Before: WILLIAMS, GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge Randolph.

RANDOLPH, Circuit Judge:

The National Treasury Employees Union is the bargaining representative for employees of the United States Customs Service, an agency within the Department of the Treasury. The union brought this action to challenge an interim rule of the Customs Service defining a "customs officer" entitled to receive overtime and premium pay under 19 U.S.C. § 267, as revised in 1993.[1] The dis-

---

1. The union filed suit shortly after promulgation of the interim rule on January 1, 1994, 58 Fed. Reg. 68,520, 68,523 (1993). The rule became final in October 1994 while this litigation was pending in the district court. 59 Fed.Reg. 46,-752 (1994).

trict court granted summary judgment in favor of the government, and we affirm.

## I

### A

The Customs Service collects customs duties and excise taxes, and processes people, cargo, and mail entering the United States. Its duties also include interdicting drugs and other contraband; administering certain navigation laws; ensuring compliance with trade and export control laws; and enforcing, at the nation's borders, laws such as auto safety standards, flammable fabric restrictions, and animal quarantine requirements. The Customs Service now operates at approximately 300 U.S. ports of entry and has field offices in 22 foreign cities. *See generally* OFFICE OF THE FEDERAL REGISTER, UNITED STATES GOVERNMENT MANUAL 1996/97, at 452–53 (1996).

Throughout most of this century, those working in the Customs Service enjoyed a very generous overtime and premium pay system, set in place by the Act of Feb. 13, 1911, ch. 46, § 5, 36 Stat. 899, 901, a system unique among federal employees. In 1892, Congress had enacted an eight-hour day for all government workers. Act of Aug. 1, 1892, ch. 352, 27 Stat. 340. But customs inspectors could not count on working regular shifts. International commerce in the early 1900's came mainly by ship from Europe. No one could predict with certainty when a particular vessel would arrive. Customs inspectors were therefore on call around the clock, week in and week out, "at all times and in all weathers," 59 Cong. Rec. 2171, 2175 (1920). For this reason, and others, Congress decided that if "inspectors, storekeepers, weighers, and other customs officers and employees" had to perform inspectional work at night, or on Sunday, or on a holiday, they should be paid "extra compensation." · Act of Feb. 13, 1911, ch. 46, § 5, 36 Stat. 901.

After a series of amendments to the 1911 Act unnecessary to recount, *see, e.g., United*

States v. Myers, 320 U.S. 561, 64 S.Ct. 337, 88 L.Ed. 312 (1944), customs employees working after regular business hours, or on Sundays or holidays, became entitled to wages several times their usual hourly wage. Those performing inspectional services for any length of time on a Sunday—say just 15 minutes—received pay for 16 hours of work. U.S. GENERAL ACCOUNTING OFFICE, CUSTOMS SERVICE: 1911 ACT GOVERNING OVERTIME IS OUTDATED 14 (1991). Those working on a holiday were paid not only for 16 hours of work but also for the actual time they worked. *Id.* Those called back to work in an evening, after normal hours, received a minimum of 4 to 12 hours pay. *Id.* "Overtime for night work [was] paid at a rate of one-half day's additional pay (4 hours) for each two hours or fraction thereof of at least 1 hour that the overtime extend[ed] beyond 5:00 p.m. These rates [could] not exceed 2½ days pay (or 20 hours) for the full time period 5:00 p.m. to 8:00 a.m. (15 hours)." CONGRESSIONAL RESEARCH SERVICE, OVERTIME AND PREMIUM PAY FOR U.S. CUSTOMS SERVICE OFFICERS: STATUTES COMPARED WITH 103D CONGRESS PROPOSALS 9 (1993).[2]

For many years Congress exhibited little interest in the expense of all this, doubtless because the federal treasury was not footing the bill. Importers and shippers reimbursed Customs for inspectional overtime on an "as needed" basis, a tradition dating back to 1799, and perhaps earlier. The Fifth Congress required ships coming from foreign ports to unload their cargo "between the rising and setting of the sun," unless the "collector of the port" issued a "special license," available for a suitable fee of course. Act of Mar. 2, 1799, ch. 22, § 50, 1 Stat. 665. A century passed before each port's collector of customs became charged with a statutory duty to "distribute" the special license fees "among the inspectors assigned to superintend the unlading of the cargo" at night. Act of Mar. 3, 1873, ch. 240, 17 Stat. 579.

In 1984 Congress began authorizing Customs to collect fees for services previously

---

**2.** Other federal employees, governed by the Federal Employees Pay Act, 5 U.S.C. §§ 5541–5549, now receive 1½ times their basic hourly wage for working more than 8 hours in a day or 40 hours in a week, a 10% pay premium for night work, a 25% pay premium for work on Sundays, and twice their normal pay for work on holidays.

exempt from charges. Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 236, 98 Stat. 2948, 2992–93. Shortly thereafter, the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, §§ 13031–13033, 100 Stat. 82, 308–11 (1986), prescribed "user fees" for international passengers and cargo carriers, replacing earlier laws that had carriers directly reimbursing Customs for overtime services as provided. Rather than going directly to the Customs Service, these fixed user fees were deposited into a Treasury Department account—the Customs User Fee Account. The account was then used to refund appropriations that Customs used to pay for overtime inspectional activities.

Concern about the increasing amounts Customs was drawing from this Treasury account for overtime pay—$103 million in 1990, up from $57 million in 1985—prompted members of the House Ways and Means Committee to request the General Accounting Office to investigate. The GAO completed its assignment in June 1991. Its report, and hearings before a Ways and Means subcommittee, led to the 1993 Customs Officer Pay Reform Amendments, revising the 1911 statute and providing that certain excess funds in the Customs User Fee Account, up to $18 million annually, shall be transferred to the general fund of the Treasury. Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, §§ 13811–13813, 107 Stat. 312, 668–72.

### B

The 1993 amendments to § 267 entitle each "customs officer who is officially assigned to perform work in excess of 40 hours in the administrative workweek of the officer or in excess of 8 hours in a day" to overtime compensation at the rate of twice the basic hourly rate. 19 U.S.C. § 267(a)(1). Customs officers who are called back to do overtime work generally receive credit for at least 2 hours of work and are paid 3 times the basic hourly rate for commuting time. *Id.* § 267(a)(2). If the majority of the hours of a customs officer's regular shifts fall between 3:00 p.m. and 8:00 a.m., the officer is entitled to premium pay of between 15% and 20%

above the basic hourly rate for those hours. *Id.* § 267(b)(1). Customs officers receive 1½ times the basic hourly rate for regularly scheduled work on Sundays, *id.* § 267(b)(2), and twice the basic hourly rate for regularly scheduled work on holidays, *id.* § 267(b)(3). With the exception of the provision for officers called back to work, premium and overtime pay is now only available for time actually worked and customs officers are not paid for minimum periods of time.

The portion of the revised § 267 that is the object of this litigation is as follows:

> the term "customs officer" means an individual performing those functions specified by regulation by the Secretary of the Treasury for a customs inspector or canine enforcement officer. Such functions shall be consistent with such applicable standards as may be promulgated by the Office of Personnel Management.

19 U.S.C. § 267(e)(1). The Customs Service took this provision as a directive, or an authorization, to promulgate a regulation, which states in relevant part:

> *Customs Officer* means only those individuals assigned to position descriptions entitled "Customs Inspector," "Supervisory Customs Inspector," "Canine Enforcement Officer," or "Supervisory Canine Enforcement Officer."

19 C.F.R. § 24.16(b)(7).

### II

The union's challenge to the regulation rests on the idea that § 267(e)(1) required the Customs Service to list "functions," not positions according to job descriptions. Duties assigned to customs inspectors and canine enforcement officers, we are told, are sometimes also performed by persons not holding those titles. As the union sees it, if Customs had complied with § 267(e)(1) and developed a regulation listing tasks, any customs employee performing those tasks, regardless of the employee's official title, would become a "customs officer" entitled to overtime and premium pay under § 267.

The union's reading of § 267(e)(1) rests on what may be a misconception, one the Customs Service itself entertains. Both parties

think § 267(e)(1) commanded Customs to promulgate some sort of new regulation. But the language of the provision scarcely says as much. Section 267(e)(1)'s reference to "functions specified by regulation by the Secretary of the Treasury" may be taken as a reference to pre-existing regulations. Federal agencies issue written classifications of the positions in the agency. These are often detailed documents, specifying the duties, functions, and qualifications of the offices. *See Kleiman v. Department of Energy*, 956 F.2d 335, 336 n. 1 (D.C.Cir.1992); 5 U.S.C. §§ 5101–5115. As one would expect, before the 1993 amendments to § 267, Customs already had "Position Descriptions" for its employees, including customs inspectors and canine enforcement officers, specifying the functions of those holding the positions.[3]

These Position Descriptions seem to be the equivalent of what § 267(e)(1) refers to as a "regulation." Courts and Congress treat the terms "regulation" and "rule" as interchangeable and synonymous. When we speak of an agency's "regulation"—a term nowhere mentioned in the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*—we have in mind what the APA defines as a "rule," that is,

> the whole or part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or al-

lowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4). Position Descriptions could fit comfortably within § 551(4). They constitute agency statements of future effect describing the agency's organization and practices. As rules dealing solely with "agency management and personnel," the Position Descriptions for customs inspectors and canine enforcement officers would be exempt from the APA's rule making requirements, 5 U.S.C. § 553(a)(2), but that would not affect their status as "rules," and hence "regulations" of the sort mentioned in § 267(e)(1).

On this view of § 267(e)(1), it was unnecessary for Customs to promulgate the new regulation we have before us. Customs already had regulations, in the form of Position Descriptions, specifying the functions of the two positions. There is not a hint that in amending § 267, Congress wanted Customs to modify its existing standards for customs inspectors and canine enforcement officers. Even in its new regulation Customs made no such change. Its new regulation, promulgated after the revision of § 267, merely relies on "regulations" already in effect: "*Customs Officer* means only those individuals assigned to position descriptions entitled 'Customs Inspector,' 'Supervisory Customs Inspector,' 'Canine Enforcement Officer,' or 'Supervisory Canine Enforcement Officer'." As such, this new regulation may have added nothing, but it is unnecessary to decide the question.

Even if § 267(e)(1) required Customs to come up with an implementing regulation,

---

**3.** Counsel informed us that the Customs Service currently has 340 separate, official Position Descriptions for Customs Inspectors and 44 official Position Descriptions for Canine Enforcement Officers. A typical Position Description includes the following under the heading "Passenger Processing" and the subheading "Enforcement":

Enforces Customs laws and those of other agencies in passenger and baggage inspection work. In situations involving a wide variety of conditions and complexities, makes on-the-spot decisions in recognizing and evaluating conditions and circumstances that may provide evidence of smuggling, fraud, terrorism, and other violations. Apprehends, searches, detains, and arrests, if warranted, violators of the civil and criminal laws of the United States, requiring skill in de-

fensive techniques, including firearms proficiency. Identifies, subdues, if necessary, arrests (if granted peace officer status by the state), and detains wanted persons on Federal, State, and local warrants. Utilizes and applies enforcement tools which include, but are not limited to, the Treasury Enforcement Communications System, National Crime Information Center, National Law Enforcement Telecommunications Systems, selective enforcement systems, questioning of passengers, and smuggling profiles. Reviews import/export documentation to identify patterns of violations and of contraband smuggling. Prepares reports of enforcement activities including search/Arrest/Seizure Reports, Memorandum of Information Received, etc.

the one it promulgated must be sustained. It seems clear to us, as it did to the Customs Service, that the new overtime and premium pay provisions in § 267 turn on *who* is performing the work. While that "who" is defined in terms of the functions of customs inspectors and canine enforcement officers, the criteria for paying overtime or premium pay are not. For instance, the statute provides that "a customs officer who is officially assigned to perform work in excess of 40 hours" in a workweek shall be compensated at twice his usual hourly wage. 19 U.S.C. § 267(a)(1). There is nothing in this language that makes overtime pay dependent on what functions the "customs officer" performs during his overtime hours. The same is true with respect to the premium pay provisions. "A customs officer who performs any regularly scheduled work on a Sunday" is entitled to time-and-a-half pay. 19 U.S.C. § 267(b)(2). "A customs officer who performs any regularly scheduled work on a holiday" gets double time. *Id.* § 267(b)(3). These Sunday and holiday provisions, like the overtime provision, indicate that a certain class of people—"customs officers"—are entitled to premium pay if they work at certain times. Section 267(e)(1) defines that class, as does the regulation the Customs Service promulgated.

The union's reading of § 267—in which employees could be a "customs officer" one moment, and not a "customs officer" the next, depending on what particular work they were doing—also cannot be squared with the provisions relating to nighttime work. Section 267(b)(1)(A) provides a 15% or 20% pay premium "[i]f the majority of the hours of regularly scheduled work of a customs officer" occur between 3:00 p.m. and midnight. This can only be read as referring to the work schedules of a well-defined class of people: under § 267(e)(1) and the regulation, those who meet the Customs Service definition of customs inspectors and canine enforcement officers. Section 267(b)(1)(A) cannot possibly mean that other employees who regularly work the night shift are also entitled to premium pay whenever they perform any functions that might be assigned to persons in those two positions.

There are other difficulties of administration lurking in the union's approach. If a customs employee works the first three hours of a week doing a job normally assigned to a customs inspector and then works forty more hours as a mail specialist, which are the overtime hours? It would be odd to suppose that a customs employee should get double time for three hours spent inspecting baggage on Monday morning just because the employee came in specially at his supervisor's request to do his regular work as a mail specialist on Saturday.

The union points to instances in which Customs employees with the Position Description "Import Specialist" sometimes inspected passengers and baggage on an overtime basis and in which customs inspectors worked alongside employees with the Position Description "Mail Specialist." One may wonder about the equity of providing special overtime and premium pay to customs inspectors but not to import specialists and mail specialists performing the same tasks, but the practice is sanctioned by the statute. Only a limited number of Customs employees count as "customs officers" under § 267, and import specialists and mail specialists are not among them, whatever the nature of their work. If a mail specialist's job is truly the same as that performed by customs inspectors, his real complaint is that Customs has classified him as a mail specialist rather than a customs inspector, not that the Customs Service regulation excludes mail specialists from the class of "customs officers."

It is quite certain that Congress meant to limit the amount of overtime and premium pay being drawn from the Customs User Fee Account. That it did so by limiting the class of Customs employees eligible for the special overtime and premium pay provisions finds support in § 267's history as well as its text. The fact that customs employees other than customs inspectors received special overtime and premium pay under the old statute figured prominently in the criticisms that led to reform. *See, e.g.,* U.S. GENERAL ACCOUNTING OFFICE, CUSTOMS SERVICE: 1911 ACT GOVERNING OVERTIME IS OUTDATED, *supra,* at 37; *U.S. Customs Service's Abuse of Overtime Compensation: Hearing Before the Sub-*

**162**

comm. on Oversight of the House Comm. on Ways and Means, 102d Cong., 1st Sess. 73, 82–83, 122–23, 148 (1991). It is thus significant that while the pre–1993 overtime and premium pay system applied to all "customs officers and employees," 19 U.S.C. § 267 (1988), the amended statute limited eligibility to "customs officers," thereby narrowing the class.

We therefore conclude that the Customs Service regulation, while perhaps superfluous, conforms to § 267(e)(1) and reflects the most sensible interpretation of how Congress meant to have eligibility for overtime and premium pay determined under § 267.

*Affirmed.*