**NATIONAL TREASURY EMPLOYEES UNION, Ronald J. Rizzo, Norma McMullen, Henry Schade, Edward Stroface, Francis Carelli, and All Similarly Situated Unnamed Plaintiffs, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

Nos. 292–86 C, 153–88 C.

United States Claims Court.

May 24, 1990.

As Amended on Denial of Reconsideration June 20, 1990.

Cary P. Sklar, with whom was Gregory O'Duden, Washington, D.C., for plaintiffs.

Stephen J. McHale, with whom were Director David M. Cohen, and Asst. Atty. Gen. Stuart M. Gerson, for defendant.

### OPINION

WIESE, Judge.

The plaintiffs in this consolidated action are officers of the United States Customs Service who were temporarily assigned to the vessel entry facility at Key West, Florida, to assist existing staff there in controlling an influx, from Cuba, of thousands of undocumented aliens.[1] Plaintiffs' claims are based on the contention that they received insufficient compensation for the overtime work performed during this emergency operation. They argue that they are entitled, as a matter of law, to overtime compensation at twice their normal rate of pay rather than the time-and-a-half rate which they did receive. The issue is before us on cross-motions for summary judg-

---

1. Plaintiffs appear here through their union representative, the National Treasury Employees Union (NTEU). NTEU is the exclusive bargaining representative for approximately 120,000 federal employees located in various agencies of the Executive Branch. Among the employees represented by NTEU are approximately 12,000 employees in the U.S. Customs Service.

ment. The matter has been fully briefed and argued; we hold for the defendant.

## I

Beginning in April of 1980, large numbers of refugees began fleeing from Mariel, Cuba in private and commercial boats bound for Florida. The first few boats arrived in Florida on or around April 21, 1980. Thereafter, arrivals increased rapidly, peaking in May and June, and continuing into the following Fall. This nongovernmentally-sanctioned influx, which came to be known as the Mariel Boatlift, involved over 125,000 refugees and more than 2,500 vessels. Few, if any, of the refugees had the documentation necessary for entry into the United States.

At the direction of the Attorney General of the United States, the Government responded to this emergency by undertaking an enforcement effort "to prevent jeopardy" to the lives of the refugees and "to deter the continued departure of vessels to Cuba for the purposes of transporting aliens to this country unlawfully." [2] As part of this effort to control illegal entry into the United States, beginning in late April of 1980, boats entering from international waters were directed by the Coast Guard into Key West, Florida, where the Government had in place a screening operation to process the incoming boats and refugees. In Key West, Customs Service inspectors—among them the plaintiffs in this action—together with representatives of the Immigration and Naturalization Service, the Office of the United States Attorney, and other federal agencies, assisted in meeting the incoming boats, providing humanitarian aid to refugees and, in appropriate circumstances, securing and seizing ships and arresting ship captains for viola-

tions of immigration laws and customs statutes.

However, as the boatlift continued and the scale of the exodus became more apparent, the Government found it necessary to increase the intensity of its enforcement efforts. Thus in mid-May of 1980, Customs officials were instructed to begin seizing all vessels unlawfully carrying Cubans into the United States, rather than simply assessing fines and restricting seizures to vessels carrying an excessive number of aliens.

At the outset of the interdiction effort, Customs officers received compensation for overtime [3] hours measured at twice their basic rate of pay. This rate of compensation—commonly called "1911 overtime" in reference to the year in which the double hourly rate was first enacted into law—is the statutory rate that is specified for Customs personnel when engaged on an extra-hours basis in the performance of traditional boarding officer functions or baggage and cargo inspections. However, in mid-May of 1980 (at the time the decision was made to step-up the Government's enforcement actions) the Customs Service decided to discontinue compensating at the double hourly rate; in its place the Agency instituted the standard time-and-a-half rate that is authorized for all federal employees under the Federal Employees Pay Act, 5 U.S.C. § 5542 (1988). It is this administrative pay action which prompts the present suit.

Initially, the National Treasury Employees Union (NTEU) contested the Customs Service's determination not to pay 1911 overtime rates by invoking the grievance procedures of the collective bargaining agreement in force between the Customs Service and its union employees. However, when relief through this source proved to be unavailable,[4] NTEU, together with five

---

**2.** The quotations are taken from an April 26, 1980, Memorandum of the Attorney General titled "Law Enforcement Policy on Transport of Cubans to the United States." The memorandum was addressed to the United States Attorney in the Southern District of Florida.

**3.** The term "overtime" as used in this opinion refers to work beyond normal working hours

performed after 5 P.M. and before 8 A.M. or work performed on Sundays and holidays.

**4.** At the time suit was commenced here—some five years after the grievance procedures were first invoked—the arbitrator had not yet ruled on the dispute. Eventually, a decision was entered by the arbitrator holding that he lacked jurisdiction to decide the matter.

of the named plaintiffs, filed suit in this court and simultaneously moved for certification of a class. The request for class action treatment was denied by an order entered on March 11, 1988; thereupon the remaining plaintiffs filed a separate suit here on May 4, 1988. The two suits were subsequently consolidated for purposes of decision.

## II

The statutes at issue here, *i.e.,* the provisions granting overtime compensation at the double hourly rate, are sections 261 and 267 of Title 19 of the United States Code. The first of these sections, section 261, specifies the compensation due Customs officers when serving as boarding officers. The statute says that Customs officers acting as boarding officers:

> shall be allowed extra compensation for services in boarding vessels at night or on Sundays or holidays—at the rate prescribed by the Secretary of the Treasury as provided in section 267 of this title, the said extra compensation to be paid by the master, owner, agent, or consignee of such vessels.

The second statute, section 267, is broader in scope, but it too relates entitlement to overtime compensation to particular ship-service activities and to particular funding sources. The statute reads in principal part as follows:

> The Secretary of the Treasury shall fix a reasonable rate of extra compensation for overtime services of customs officers and employees who may be required to remain on duty between the hours of five o'clock postmeridian and eight o'clock antemeridian, or on Sundays or holidays, to perform services in connection with the lading or unlading of cargo, ... or in connection with the unlading, receiving, or examination of passengers' baggage, such rates to be fixed on the basis of one-half day's additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o'clock postmeridian (but not to exceed two and one-half days' pay for the full period from five o'clock postmeri-

dian to eight o'clock antemeridian), and two additional days' pay for Sunday or holiday duty. The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted....

The question we address is whether these two provisions apply to the overtime work plaintiffs performed during the boatlift.

We begin our analysis by noting that the statutory requirement that overtime services are to be paid for by the vessel owner rests on the assumption that the services are being provided at the request of such owner. That correlation is apparent from the words of section 267: "said extra compensation shall be paid by the ... owner ... of such vessel ... whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted."

Plaintiffs do not go along with this reading of the statute. They maintain that a request for the services is not necessary—at least not as far as the Government's liability to its employees is concerned. For purposes of fixing the Government's obligation to pay, it is irrelevant, argue plaintiffs, whether overtime services were performed at the Government's direction or a vessel owner's request. All that matters is that the services were performed. In support of their position they rely on the decision in *United States v. Myers,* 320 U.S. 561, 64 S.Ct. 337, 88 L.Ed. 312, 1051 (1944).

That case does not support plaintiffs' argument. The compensation for overtime inspection services that was in issue there involved services that had been performed *at the request of the carriers involved.* That is clear from the Court's statement of the issue:

> A carrier may procure customs service at night only by special license, and the statutes say the extra compensation shall be paid 'by the licensee' to the collector of customs who shall pay the same 'to

the inspectors.' As the extra compensation here sued for was not collected in whole or part from the carriers concerned, it is urged that the United States is not liable to the plaintiff. [320 U.S. at 566, 64 S.Ct. at 341 (footnotes omitted).]

The court went on to hold that the failure of the Government to collect from the carrier would not relieve it of liability for the extra pay due the inspectors. Said the Court:

> The work is done under the statutes. No inspector may 'receive any salary in connection with his services as such an official or employee from any source other than the Government of the United States.' Act of March 3, 1917, c. 163, 39 Stat. 1106. These payments are made by the licensees to the collector at rates fixed by the Secretary of the Treasury. This is extra compensation over and above the annual salary, not a payment from licensees. Section 451 [the predecessor to 19 U.S.C. § 1451, the statute implementing 1911 overtime] requires a bond from the licensee to 'pay the compensation and expenses of the customs officers,' but the payment must be made to the collector under § 5 [the predecessor to 19 U.S.C. §§ 261 and 267]. These facts lead us to the view that the statutes create an obligation on the part of the United States to pay to inspectors such sums as they may earn under their provisions. [561 U.S. at 567, 64 S.Ct. at 341 (footnote omitted).]

It is clear from the quoted texts that *Myers* does not resolve the issue presented here. All that *Myers* can legitimately be read to say is that the Government's obligation to pay is coextensive with its right to collect.

Plaintiffs go on to argue that even if the court considers a request for overtime services essential to the statutory scheme, that condition was satisfied here, if not expressly, then by implication. The essence of their argument is that living conditions on board the vessels involved in the boatlift were often intolerable, with many of the vessels arriving in a dangerously overloaded state. In the words of one of the witnesses at the arbitration hearing, "those boats were living hell holes." Under these adverse circumstances, argue plaintiffs, the overtime services they provided to the incoming vessels were much more a matter of necessity than choice. The risks to human life and property dictated disembarkation as soon as possible. Thus, they maintain that a "request" for boarding officers' services was implicit in the circumstances. Plaintiffs go on to say that the same is also true in the everyday performance of their duties. Vessel boardings, they point out, are often conducted in the absence of any formal request for the service, the request being implicit in the presentment of the vessel at dockside.[5]

The Government answers the argument by saying that plaintiffs have too narrow a view of the matter. The statutes we are concerned with here, the Government points out, were intended to serve the ordinary flow of commerce by providing requested, after-hours boarding services for the convenience of people arriving outside of normal working hours. That intention, continues the argument, is manifest from the statutes' wording: they address overtime "services." The Mariel Boatlift, by contrast, was an undertaking designed to bring illegal aliens into the United States, and the Government's involvement in that operation was directed towards stopping it. To that end, the Mariel vessels were directed into the Key West facility under the compulsion of Coast Guard patrols and the boardings were conducted at the Government's initiation and according to the Government's schedule, not the vessel owner's convenience. Thus, the work plaintiffs performed was done as part of a Government-initiated police effort to enforce the immigration laws rather than as routine customs activity.

For the Government then, the circumstances of the Mariel Boatlift mark that

---

**5.** During the reargument of this case, the court was told that boarding without a formal request is a practice followed only in the case of pleasure craft, not commercial vessels. We do not think this distinction is important here given that many of the vessels involved in the boatlift were, in fact, private vessels not regularly engaged in commerce.

situation as one totally foreign to the interests Congress had in mind in enacting sections 261 and 267. Therefore, the argument concludes, the court should recognize that even though some of plaintiffs' activities may come within the letter of the law, they do not come within its "spirit" and are therefore not within its intention.

We agree with the Government's position. The statutes speak of overtime "services," and they identify those services as activities that are initiated and paid for by a vessel owner. In such a context, the term "services" denotes a consensual undertaking. That is not what we have here. The duties that plaintiffs performed were undertaken at the Government's direction and were performed according to the Government's work schedule, *i.e.*, as time and personnel would allow. The notion underlying the statutory scheme—a service provided for the convenience of the vessel owner—is altogether lacking here. The fact that the vessel owners may have gone along with the boardings under compulsion of their own dire circumstances does not alter the essential nature of the undertaking. The controlling fact is that, both as to place of inspection (Key West) and time of inspection, plaintiffs were responding to Government orders and not vessel owner requests. And it is only for the latter situation that enhanced overtime compensation is authorized.

That this distinction is indeed critical to the statutory scheme is confirmed by the statutes' legislative history. As explained by Congressman Moore of Pennsylvania, one of the principal sponsors of the bill, the aim of the legislation was to facilitate commerce by extending to tramp steamers and other cargo-carrying vessels the privilege of unloading at night. However, the cost of this service was not to be borne by the Government; it was a service to be paid for by the vessel owners. On the matter of payment, Congressman Moore's statement before the Congressional Committee reads in part as follows:

> The owner of the vessel pays for this extra work. He is perfectly willing to pay for the extra work. Not a cent comes out of the Treasury, and you would not be legislating at all with regard to the finances of the Government. The owner of a vessel comes in and wants to get away, and he asks the privilege of unlading at night between sunset and sunrise, the hours proscribed under the law.

Congressman Moore continued:

> The provisions of this bill contemplate the entry of a bond that will enable the owner or agent of a vessel to provide through the collector of the port, at the instance and by the direction of the Secretary of the Treasury, a fund from which these employees of the Government may be paid. They ought to be paid for their extra time. They serve the Government and receive compensation for the service they render, but they are not altogether serving the Government when they do this work in the night hours; they are serving very largely the owner or the agent of the vessel, who is perfectly willing to pay for the services. *Hearings on H.R. 9525 Before the House Committee on Ways and Means,* 61st Cong., 2d Sess. 461, 462 (1910).

The law as enacted in 1911, Act of February 13, 1911, ch. 46, § 5, 36 Stat. 901, and as it reads today, 19 U.S.C. § 261, retains this essential payment feature: "said extra compensation to be paid by the master, owner, agent or consignee of such vessels."

### III

On the basis of the foregoing, we think it clear that entitlement to the enhanced overtime contemplated by sections 261 and 267 cannot arise absent the performance of customs officer duties that have been requested by—and thus are chargeable to—an incoming vessel. Since these requirements were not met here, plaintiffs have no claim to overtime beyond the amounts already paid them. Accordingly, defendant's motion for summary judgment is granted and plaintiffs' cross-motion for summary judgment is denied. The Clerk is directed to enter judgment dismissing the complaint.