950 F.2d 1562
 30 Wage & Hour Cas. (BNA) 1103, 120 Lab.Cas.
P 35,596
 NATIONAL TREASURY EMPLOYEES UNION, Ronald J. Rizzo, Norma
McMullin, Henry Schade, Edward Stroface, Francis Carelli,
Salvatore Barbieri, Jr., Vito M. Basile, Leila A. Fraley,
Vincente Fuster, Estate of Manuel E. Lopez, Ruel A. Murphy,
Nathaniel M. Norwood, Edward A. Perez, Walter Phillips,
Jeanne E. Hernandez Rogers, Alvarez M. Blair Sweeting, Elvin
Neal Tish, Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee.
 No. 90-5122.
 United States Court of Appeals,
Federal Circuit.
 Dec. 11, 1991.
Rehearing Denied April 1, 1992.
Suggestion for Rehearing In Banc Declined
April 1, 1992.
 
 Cary P. Sklar, Sr. Trial Counsel, of the National Treasury Employees Union, Washington, D.C., argued (Gregory O'Duden, Director of Litigation and Elaine Kaplan, Deputy Director of Litigation, on brief), for plaintiffs-appellants.
 Hillary A. Stern, of the Civ. Div., Dept. of Justice, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Jeanne E. Davidson, Asst. Director, and Anthony J. Ciccone. Of counsel was Currita C. Waddy, Office of Chief Counsel, U.S. Customs Service, Washington, D.C., on brief), for defendant-appellee.
 Before CLEVENGER, Circuit Judge, COWEN, Senior Circuit Judge, and RADER, Circuit Judge.
 CLEVENGER, Circuit Judge.
 
 
 1
 Plaintiffs-Appellants are inspectors for the United States Customs Service who were temporarily ordered to assist in controlling an influx of refugees fleeing Cuba in private and commercial boats and entering the United States at Key West, Florida in 1980, an event commonly known as the Mariel boatlift. The Customs inspectors appeal the judgment of the U.S. Claims Court, on motion for summary judgment, that the Government was not required to pay the inspectors the statutory overtime pay rate supplied by 19 U.S.C. §§ 261, 267 (1988),[1] for reporting for duty in connection with the Mariel boatlift. NTEU v. United States, 20 Cl.Ct. 490 (1990). We vacate the grant of summary judgment and remand for proceedings consistent with this opinion.
 
 
 2
 * Sections 261 and 267 require payment of extra compensation, called "1911 overtime" after the date of first enactment of the statute, for Customs inspectors who report for overtime duty on Sundays, holidays, or at night.
 
 
 3
 During the Mariel boatlift, the Customs inspectors helped process over 125,000 refugees who arrived in more than 2,500 private or commercial vessels. Until mid-May, 1980, the Government paid the Customs inspectors 1911 overtime pay from fees paid by the vessel captains, as provided by the statute. In May, the Government decided to seize all vessels involved in the boatlift in order to stop further illegal immigration. At that time, the Government also decided to discontinue compensating the Customs inspectors at the 1911 overtime rate, and therefore ceased collecting payments from the vessel captains for that purpose. All incoming vessels were thereafter compelled by the Coast Guard to the port of Key West where the Customs inspectors had reported for duty. At Key West, the inspectors performed some boarding officer functions, as defined in the statutes, such as inspecting manifests and the passengers' baggage. Because the passengers had little baggage, the majority of the inspectors' time was spent assisting other agencies in the seizure of vessels and detention of undocumented aliens at the direction of the U.S. Immigration and Naturalization Service.
 
 II
 
 4
 The Claims Court held that, in the context of the statutes, "the term 'services' denotes a consensual undertaking. That is not what we have here." NTEU, 20 Cl.Ct. at 494. The Claims Court concluded that entitlement to 1911 overtime pay "cannot arise absent the performance of customs officer duties that have been requested by--and thus are chargeable to--an incoming vessel." Id. The Claims Court thus agreed with the Government's contention below that 1911 overtime pay could not be earned when the inspection efforts were a "part of a Government-initiated police effort to enforce the immigration laws rather than as routine customs activity." Id. at 493. Thus, the Claims Court decided that the statutory requirement for 1911 overtime pay applied only when the Customs inspectors were responding to vessel owner requests, rather than Government orders pursuant to a police effort. Id. at 494. In this case, specifically, the Claims Court found that, when the facts were viewed in a light most favorable to appellants, no request, either actual or implied, had been made by the vessel captains.
 
 
 5
 We review the Claims Court's grant of summary judgment de novo, construing the facts in a light most favorable to the non-movant, to determine whether the grant was in error. Doyle v. United States, 931 F.2d 1546 (Fed.Cir.1991); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed.Cir.1987).
 
 III
 
 6
 We turn first to the argument that the nature of the overtime services actually provided governs whether the Customs inspectors are entitled to 1911 overtime pay. The Government characterizes the distinction as being between "law enforcement" and "inspectional customs services" furnished for commerce. Our respected dissenting colleague refers to the apprehension and processing of illegal aliens as being the type of activity that is not a commercial overtime service.
 
 
 7
 At oral argument, the Government agreed that the inspectors performed some boarding officer functions during hours that would generally entitle the appellants to 1911 overtime pay, but contended that those functions were not compensable under the 1911 statutes if performed at the Government's direction and not at the vessel owner's request. The Government did concede that there is "no law enforcement exception" per se to entitlement to 1911 overtime pay, because, in any event, routine Customs inspections are themselves law enforcement. This concession is consistent with the Comptroller General's decision to allow 1911 overtime pay for inspectional duties performed as part of "Operation Horse," an intensified enforcement effort towards interdiction of narcotics. Kenneth J. Corpman, B-214845 (Comp.Gen. April 12, 1985).
 
 
 8
 The transparent logical error in the dissent's position is demonstrated by the Government's acknowledgement that all Customs inspections are themselves a form of law enforcement. One could hardly characterize a Customs inspection for illegal contraband as a commercial service which importers freely request at hours to suit their commercial convenience. Custom inspectors are employed to interdict, or to assess duties upon, otherwise illegally imported commodities.
 
 
 9
 In any event, the simplest answer to the Government's contended "law enforcement exception" to 1911 overtime pay which would look to the activities actually performed by the inspectors is that the statute expressly states that "[s]uch extra compensation shall be provided if such officers or employees have been ordered to report for duty and have so reported, whether the actual lading, unlading, receiving, delivery, or examination takes place or not." We cannot read this language to direct our attention to the character of the specific services that were actually rendered after reporting for duty. Therefore, we see no need to craft a tortuous distinction between traditional customs law enforcement and activities that may be directed to enforcement of other statutes. Nor do we propose to require that Customs inspectors identify overtime spent upon enforcement of Customs laws from that spent otherwise, and provide differing recompense for overtime accordingly.
 
 
 10
 Furthermore, the evidence demonstrates, as to the services themselves, that the inspectors, inter alia, boarded the vessels to examine the manifests and the baggage the refugees had with them. During the entirety of the boatlift, the inspectors completed, in varying degrees of thoroughness, standard customs forms relating to vessels and their cargo. Thus, boarding and inspection services were performed. Finally, that the Government may be required to pay Customs inspectors a different rate than other law enforcement personnel for identical overtime services cannot be dispositive of the Customs inspectors' entitlement to overtime pay under a statute designed only for them.
 
 
 11
 In any event, binding case law precludes the dissent's examination of the actual activities the inspectors were ordered to perform. Our predecessor court held that a decision on entitlement to 1911 overtime is made without reference to whether any duties were actually performed by Customs inspectors after reporting for duty as ordered. This court has bound itself, in banc, to follow statements of the law set out by its predecessor courts. South Corp. v. United States, 690 F.2d 1368, 1370 (Fed.Cir.1982). In a directly pertinent decision by the Court of Claims, O'Rourke v. United States, 109 Ct.Cl. 33 (1947), a Customs inspector claimed 1911 pay for overtime services rendered as an inspector at the Canadian border in Minnesota. The Government contended, as one ground for denial of 1911 overtime pay, that O'Rourke "did not actually perform customs services" throughout the overtime for which compensation was claimed. Id. at 47. The court stated that "this fact is immaterial. The plaintiff was required to be at his post, during specified hours, as the representative of the Government for customs services." Id. The court concluded that "[t]he employee's overtime pay, then, is founded upon his being required by the Government to remain overtime, and not upon the particular services that he renders during the overtime." Id. at 48; see also Brown v. United States, 109 Ct.Cl. 52 (1947); Ostroot v. United States, 109 Ct.Cl. 57 (1947).
 
 
 12
 The Government thus does not argue that the activities actually performed, search and seizure of vessels and undocumented aliens, bar payment of 1911 overtime pay, nor does it contend that the 1911 statutes explicitly require a formal request for boarding officer services before entitlement to 1911 overtime pay can be claimed. The Government's case rests on its view that the statutes implicitly require a specific request for overtime customs services by the vessel captains, and the Claims Court's finding, challenged by the inspectors, that such a request was lacking here.
 
 IV
 
 13
 Before proceeding to the issue of whether a request for 1911 overtime services is required or was made in this case, we must dispose of the other contention that actual collection of cash deposits or bonds from, or issuance of special licenses to, vessel owners is required as a prerequisite for 1911 overtime pay. This issue was resolved in Myers v. United States, 99 Ct.Cl. 158 (1943), aff'd, 320 U.S. 561, 64 S.Ct. 337, 88 L.Ed. 312 (1944), when the Court of Claims rejected the Government's contention that "unless work is performed under a special license granted by the collector, no extra compensation accrues and nothing can be paid." Id. at 172, 174-75. In Myers, Customs inspectors worked throughout the day at the Ambassador Bridge and the Detroit and Canada Tunnel inspecting merchandise and baggage carried by both pedestrian and commercial vehicular traffic. Id. at 160. The "[t]raffic was continuous for twenty-four hours per day and included foot passengers, vehicular traffic, commercial trucks and busses." Id. at 161.
 
 
 14
 In Myers, the amounts claimed by the inspectors had not been collected in whole or in part from the several carriers who had been inspected during overtime. Id. at 168. The conclusion is inescapable, therefore, that the Customs Service had not collected cash deposits, required the issuance of special licenses nor the posting of bonds, before it provided overtime Customs inspection services. This conclusion is made explicit in a later Court of Claims opinion that discussed the underlying facts in Myers:
 
 
 15
 [The Government] had not paid the employees the extra compensation and had not required the toll facilities to post security or reimburse it.
 
 
 16
 O'Rourke, 109 Ct.Cl. at 42.
 
 
 17
 Thus, the mere fact that the "Government's obligation to pay [1911 overtime pay] is coextensive with its right to collect" cash or payment on bonds, NTEU, 20 Cl.Ct. at 493, does not mean that the Government may thereby disenfranchise the Customs inspectors by unilaterally declining to require payment from importers.
 
 
 18
 On review of the Court of Claims decision in Myers, the Supreme Court agreed that actual collection by the Government, by cash, bond, or license fee, of payment for overtime services was not a prerequisite to overtime pay, stating:
 
 
 19
 [The Government] is an employer who issues orders to the inspectors directing the performance of services. The work is done under the statutes. No inspector "may receive any salary in connection with his services as such an official or employee from any source other than the Government of the United States." Act of March 3, 1917, c. 163, 39 Stat. 1106 [ (codified as amended at 18 U.S.C. § 209(a) (1988)) ]. These payments are made by the licensees to the collector [of customs] at rates fixed by the Secretary of the Treasury. This [pay to the inspectors] is extra compensation over and above the annual salary, not a payment from licensees ... These facts lead us to the view that the statutes create an obligation on the part of the United States to pay to inspectors such sums as they may earn under their provisions.
 
 
 20
 Myers, 320 U.S. at 567, 64 S.Ct. at 341.
 
 
 21
 We must conclude that, although the Government under the statute may negotiate for reimbursement from the regulated entity for excess costs attributed to overtime inspections, the statute does not make the Customs inspectors merely a third party beneficiary to whatever agreement is reached with the importer, as recognized by the Supreme Court in Myers.
 
 V
 
 22
 With no law enforcement exception available to require delineation of the nature of the services performed and no requirement that the Government actually collect payments from vessel owners, we turn to whether the statute requires a request for overtime services by vessel owners and whether there was a clear and undisputed factual basis upon which the Claims Court could find that no request for the requisite inspection services was made by the vessel owners.
 
 
 23
 Customs regulations provide that overtime inspections services will be "furnished only upon compliance with the requirements of those statutes for applying for such services and giving security for reimbursement...." 19 C.F.R. § 24.16(a) (1980). The regulations further provide that "[r]equest for overtime services in connection with the entry or clearance of a vessel, including the boarding of a vessel for the purpose of preliminary entry, shall be made on Customs Form 3171," unless the owner has previously secured a special term license. 19 C.F.R. § 4.10 (1980) (note omitted). The request for overtime inspection services, under the regulations, must be made in advance and during business hours, § 24.16(a), except for pleasure vessels or private aircraft. 19 C.F.R. §§ 24.16(c)(2), (4) (1980). The regulations expressly permit a receipt for a cash deposit tendered by such a private vessel owner on arrival dockside during non-working hours to serve, after the fact, "in lieu of filing a request for overtime services on Customs Form 3171." Id. Alternatively, the private vessel owner may post a bond. 19 C.F.R. § 24.16(c)(1) (1980). Thus, at least with respect to private vessels or aircraft, there is an express exemption from any required advance request for overtime services before actual arrival at a U.S. port. For such services, when rendered, 1911 pay is authorized even without an actual advance request. Thus, in the hypothetical event of nonpayment on the bond by the vessel owner, Myers would still require that the inspectors be paid for 1911 overtime.
 
 
 24
 The Claims Court concluded that the text of the Supreme Court opinion in Myers did not resolve the question of whether the statutes require an advance request for overtime services as a predicate to entitlement to 1911 overtime pay by the inspectors. NTEU, 20 Cl.Ct. at 493. The Claims Court decided, however, that:
 
 
 25
 The statutes speak of overtime "services," and they identify those services as activities that are initiated and paid for by a vessel owner.
 
 
 26
 NTEU, 20 Cl.Ct. at 494.
 
 
 27
 The Claims Court therefore held that a request for overtime services is required. We do not find that question so easily resolved. First, while we agree that the text of the Supreme Court opinion in Myers does not reveal whether Customs inspection services were provided to pedestrians and others crossing into Detroit only upon an explicit request for overtime services, the Court of Claims opinion notes the failure of the Government to have collected fees for services rendered. The nature of the traffic makes untenable the supposition that the Government has consistently required that such requests be made in advance. Moreover, we doubt that U.S. citizens, crossing twenty-four hours a day as pedestrians from Canada to Detroit and potentially encumbered by recently-acquired dutiable merchandise, were aware of Customs regulations that require that an advance request for inspection services be made during regular business hours at penalty of being denied entrance into the United States at non-working hours. Furthermore, the Government has here acknowledged the regulatory exemption established by the U.S. Customs Service, and its consequent practice, that pleasure vessels and private aircraft are presumed to have "requested" overtime services merely by arriving dockside at any hour of the day or night. NTEU, 20 Cl.Ct. at 493 n. 5. Additionally, the Claims Court found that the precise "vessels involved in the boatlift were, in fact, private vessels not regularly engaged in commerce," id., and thus ostensibly entitled to the promulgated exemption. In the circumstances of this case, we must conclude that, if a request is required by statute, that request may be either presumed as a matter of law from the intentional acts of a private vessel owner or the Government may bear the responsibility of informing such uninitiated visitors of the requirement for a request for customs services.
 
 
 28
 There is no disagreement that Congress intervened after Myers was issued. However, that intervention was limited to providing funding from the U.S. Treasury for customs officers engaged in Myers activities. See 19 U.S.C. § 1451 (1988). Following the decision of the Court of Claims in the Myers case, the Customs Service demanded payment for the inspection services performed under the facts of that case, in order to provide the reimbursement of 1911 compensation payable to the customs officers. Such demands were made upon the owner-operators of certain border crossing facilities, who refused to cooperate. Instead, the facilities were closed or made subject to the threat of closure. Owners of 9 of the 11 bridges on the Mexican border threatened to close their facilities on Sunday, May 7, 1944. Congress responded swiftly to the international crisis arising from the payment demands made by the Customs Service. On June 3, 1944, 19 U.S.C. § 1451 was amended to provide expressly that the services provided on the facts of the Myers case would qualify for 1911 overtime compensation regardless of whether the government was reimbursed for the cost of the overtime pay earned. Both the Senate Report, the House Report and the floor debate on the emergency amendment stated in the clearest of terms that the purpose of the bill was to cope with the emergency situation which arose from the threatened closings occasioned by the demand for reimbursement by the Customs Service made to overcome the "requirements of existing law as interpreted by the United States Supreme Court in the case of the United States v. Howard C. Myers (320 U.S. 561 [64 S.Ct. 337, 88 L.Ed. 312], decided January 3, 1944." S.Rep. No. 858, 79th Cong., 2d Sess. 1 (1944); H.Rep. No. 1446, 79th Cong., 2d Sess. 2 (1944); see also 90 Cong.Rec. 4106-07 (1944); 90 Cong.Rec. 5012 (1944).
 
 
 29
 No mention is made in the legislative history of the 1944 amendment that the reasoning of the Supreme Court in Myers should be limited to services performed at the Canadian and Mexican borders, or that Myers was in any way overruled by the amendment. Instead:
 
 
 30
 The committee decided that the emergency faced by the threatened closing of the bridges did not permit time for the consideration of any proposed amendments which would alter the extra compensation provisions of existing law as interpreted by the Supreme Court.
 
 
 31
 S.Rep. No. 858, 79th Cong., 2d Sess at 2 (1944).
 
 
 32
 Whether Myers requires, or creates an exemption for, a request for overtime services is not the question we need decide, because the Claims Court's entry of judgment was based upon its conclusion that there was no genuine issue of material fact as to whether a request, implied, solicited, or otherwise, had been made in this case.
 
 VI
 
 33
 The issue, then, in this case is whether a request for Customs services can be inferred from the acts of the vessel captains. We conclude that the Claims Court failed to view the facts in a light most favorable to the inspectors, and that when the facts are so viewed, the inspectors have made a prima facie case that a constructive request for services was made by the vessel captains pursuant to a knowing participation in the Mariel boatlift. In such circumstances, the grant of summary judgment in favor of the Government cannot stand.
 
 
 34
 Instructions issued by President Carter on May 14, 1980, stated:
 
 
 35
 The Coast Guard is now communicating with these vessels illegally enroute to or from Cuba and those already in Mariel Harbor to tell them to return to the United States without taking Cubans on board. If they follow this directive, they have nothing to fear from the law.... We will take the following steps to ensure that the law is obeyed:
 
 
 36
 * * * * * *
 
 
 37
 (b) All vessels currently and unlawfully carrying Cubans to this country will henceforth be seized by the Customs Service.
 
 
 38
 White House Statement on Administration Policy Toward the Refugees, 16 Weekly Comp.Pres.Doc. 916, 917 (May 14, 1980) (emphasis deleted).
 
 
 39
 The Customs Service implemented the President's instructions on May 15, 1980. The inspectors contend that the facts--when viewed in their entirety--show multiple trips conducted by the vessel captains for hire, despite a clear warning of the consequences of their entry into United States' waters, and thus compel a conclusion that the incoming vessels were engaged in a voluntary commercial venture. The inspectors presented evidence that some vessel captains, after their own vessels were seized, secured other vessels to make multiple trips around-the-clock into Key West. Thus, the inspectors contend, the vessel captains decided to carry refugees into United States waters, knowing that entry surely meant that their vessels would be compelled to port where boarding officers functions would be rendered. Had they wished, the inspectors argue, the vessel captains could have stayed in international waters until such time as they could enter United States waters during hours not subject to 1911 overtime compensation, thereby avoiding the risk of an assessment for 1911 overtime pay. The inspectors contend that such an assessment would have been insignificant in relation to the commercial gain obtained from transporting the undocumented aliens. See Memorandum of the Attorney General, April 26, 1980, "Law Enforcement Policy on Transport of Cubans to the United States," (characterizing boatlift as the "transporting of refugees as a commercial venture.") The evidence that some captains, after their own vessels were seized, secured other vessels to make multiple trips at all hours of the day and night into Key West, supports the inspectors' contention that the commercial benefit greatly outweighed even the cost of seizure of their vessels and emphasizes that the captains intentionally entered U.S. waters with advance notice that boarding officer functions would be performed.
 
 
 40
 Finally, during the first few weeks of the Mariel boatlift, the Government collected funds from the vessel captains and in turn paid the inspectors at the 1911 overtime rate. Evidence before the Claims Court indicated that during this period a number of vessels were seized at sea under compulsion, and that their captains were charged for 1911 overtime services. The vessel captains stopped remitting fees only when the Customs Service decided, on its own initiative, to cease collecting the funds. This scenario permits the argument that had the vessel captains been asked to request overtime Customs services and continue payments for overtime services, they would have done so, much, we imagine, as the pedestrians in Myers might have been induced to place bonds or make cash deposits under penalty of return to Canada.
 
 
 41
 Thus, under the set of facts propounded by appellants, the vessel captains proceeded into United States waters fully aware, either by prior warning or past experience, that their vessels would be seized and that overtime Customs inspection services would be rendered. We discern no legal distinction between these alleged circumstances and the routine practice of recognizing a presumptive request for services by the arrival of a pleasure craft at a U.S. port.
 
 VII
 
 42
 Finally, as an alternative in support of the judgment below, the Government argues that the impossibility of collecting fees in the factual circumstances of the Mariel boatlift distinguishes this situation from Myers where the Supreme Court expressly noted that "[t]he legislative history shows that the proponents of extra compensation constantly made the point that the Government would not be out of pocket by the legislation." Myers, 320 U.S. at 566, 64 S.Ct. at 341. In sum, the Government contends that when collection of fees or bonds from vessel captains is impossible, 1911 overtime pay cannot be required by the statute. The Government made a similar argument based on impossibility in O'Rourke v. United States, 109 Ct.Cl. at 41-42. The Court of Claims concluded that Myers had left open the question of "whether or not the possibility or practicability of reimbursement was a prerequisite to the right to the extra compensation." 109 Ct.Cl. at 42-43. However, in O'Rourke, the Court of Claims concluded that it was not necessary to resolve that question because it would not have been impossible for the Government to obtain reimbursement in that case. We conclude that the uncontested facts establish the possibility of payment in this case. As noted, the Government had collected deposits or bonds before May 15. We decline to convert an administrative decision to cease requiring payment into a fact of impossibility of payment.
 
 VIII
 
 43
 On its motion for summary judgment, the Government had the burden of "pointing out to the [Claims] court[ ] that there is an absence of [record] evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). On summary judgment, the inferences to be drawn from the underlying facts contained in the materials before the trial court must be viewed in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).
 
 
 44
 According to the facts viewed most favorably to appellants, the incoming vessels were continuously engaged in a purposeful mission, the vessel captains constructively requested and consented to the inspectors' services, payment for the services was or had been chargeable to the incoming vessels, until the Government unilaterally withdrew its requirement for advance payment by bond or deposit, and some Customs inspection services were actually provided to the incoming vessels. The Claims Court did not draw all reasonable inferences in favor of appellants when it concluded that no request for overtime Customs services, assuming such a request is required, was made, either implied or actual. Accordingly, the decision of the Claims Court granting summary judgment in favor of the Government is vacated and the case is remanded for further proceedings consistent with this opinion. Upon remand, the Government will not have the benefit of a law enforcement exception to entitlement to 1911 overtime pay. The Customs inspectors will have the opportunity to prove at trial that, in the circumstances of this case, an implied request for services can be imputed to the vessel captains, if indeed, the statutes require a request, whether formal, implied, or solicited, before entitlement to 1911 overtime pay can mature.
 
 IX
 
 45
 Costs to appellants.
 
 
 46
 VACATED AND REMANDED.
 
 
 47
 RADER, Circuit Judge, dissenting.
 
 
 48
 I would affirm the Claims Court's judgment. The Claims Court held that, after May 1980, these Customs workers performed no services covered by the 1911 Act. Thus, the Government properly paid them time and one-half overtime under the Federal Employees Pay Act (FEPA), 5 U.S.C. § 5542 (1988). The 1911 Act does not provide double overtime for search and seizure of vessels apprehended for violation of U.S. immigration laws. Rather, the 1911 Act--its language, legislative history, and implementing regulations--supports the Claims Court's ruling.
 
 I.
 
 49
 To halt the illegal Mariel boatlift, the Government instituted an inter-agency interdiction of vessels en route from Cuba to Florida. The Customs Service cooperated with the United States Immigration and Naturalization Service (INS), Public Health Service, Coast Guard, Navy, Marine Corps, and Marshal's Service in the interdiction. As boats from Cuba entered United States waters, United States vessels intercepted and directed them to Key West, Florida. At Key West, Customs inspectors boarded, searched, and often seized the vessels, and took custody of the illegal aliens. During the Mariel interdiction, the INS, the Marshal's Service, and other federal employees received time-and-one-half pay under FEPA for overtime work.
 
 
 50
 At the boatlift's outset, before detection of widespread illegal activity, Customs officers received overtime payments under the 1911 Act at a rate of twice their normal pay. In April and May 1980, the Attorney General of the United States and the Regional Commissioner of the Customs Service ordered the seizure of vessels and arrest of boat owners and operators. From that time forward, appellants received a regular time-and-one-half overtime rate under FEPA.
 
 II.
 
 51
 This appeal presents a question of statutory interpretation: did the 1911 Act cover appellants' work after May 1980? Sections 261 and 267 of the 1911 Act provide extra overtime pay only for specific "overtime services." These services include Customs' normal monitoring of commercial cargo, not search and seizure activities to halt the influx of illegal aliens. Moreover, under the 1911 Act, the Customs Service only provides these "overtime services" for licensees who have requested the after-hours inspections.
 
 
 52
 Section 261 sets forth what activities qualify as "overtime services." "Boarding vessels," for instance, qualifies as a 1911 Act service. Title 19 describes "boarding vessels" as the typical monitoring of commercial traffic, i.e., examining "the manifest and other documents" and inspecting any "trunk, package, or cargo on board." 19 U.S.C. § 1581(a) (1988). Section 267 limits extra pay to services "in connection with the lading or unlading of cargo ... or examination of passengers' baggage." Under sections 261 and 267, Customs workers receive extra overtime pay only for inspecting cargo and baggage.
 
 
 53
 These Customs workers did not inspect cargo or baggage, but apprehended and processed illegal aliens. In setting forth the undisputed facts in this summary judgment proceeding, the Claims Court found that these Customs workers "assisted in meeting the incoming boats, providing humanitarian aid to refugees and, in appropriate circumstances, securing and seizing ships and arresting ship captains." National Treasury Employees Union v. United States, 20 Cl.Ct. 490, 491 (1990). These activities have nothing to do with "lading and unlading of cargo." Consequently, these activities do not fit within the 1911 Act. By its terms, the 1911 Act granted extra overtime pay for inspecting cargo, not for checking refugees' visas or arresting illegal aliens. To shoehorn appellants' searches of illegal aliens into the tight language of the 1911 Act, the majority in effect treats the illegal refugees as "cargo" ("human cargo?").
 
 
 54
 The majority correctly states: "Customs inspectors are employed to interdict, or to assess duties upon, otherwise illegally imported commodities." In this case, however, illegal aliens are not "commodities." Moreover, the Customs Service pays its employees overtime for these regular services under the FEPA. The double overtime of the 1911 Act comes only for specified "overtime services" and only after compliance with several other legal requirements.
 
 
 55
 Both sections 261 and 267 require vessel captains to file a request and obtain a license before the Customs Service assigns inspectors to perform "overtime services." Various Customs regulations amplify these requirements. Section 4.10 of 19 C.F.R. (1980) requires carriers to file an official "request for overtime services." Upon receipt of an official written request and a "cash deposit" to cover the cost of the services, the Customs Service issues a special license for the overtime services and assigns workers to duty. See 19 C.F.R. § 24.16(c); §§ 4.30(a)-(d). Section 4.30(h) of 19 C.F.R. specifies that special licenses shall issue only "on the ground of commercial necessity."
 
 
 56
 During the 1980 Mariel boatlift, the undisputed facts show that no vessel captain or owner filed an official or unofficial request for "overtime services." No vessel captain or owner posted a bond for "overtime services." No vessel captain or owner showed a commercial necessity justifying issuance of a special license. And no vessel captain or owner obtained a special license for "overtime services." Consequently, the Customs Service did not assign any inspectors to perform any services under the 1911 Act. Indeed, without a request, bond, showing of commercial necessity, and issuance of a special license, no Customs services fit within the terms of the 1911 Act.
 
 
 57
 Under the heading "Extra Compensation," section 1451 of title 19 restates and amplifies these requirements for additional overtime. Section 1451 states:
 
 
 58
 Before any such special license to unlade shall be granted, the ... owner ... of such vessel ... shall be required to deposit sufficient money to pay, or to give a bond in an amount fixed by the Secretary....
 
 
 59
 19 U.S.C. § 1451 (1988). Thus, section 1451 sets forth the special license and bonding requirements.
 
 
 60
 Next, section 1451 addresses the request requirement for "extra compensation":
 
 
 61
 Upon a request made by the owner ... of a vessel ... for overtime services of customs officers or employees at night or on a Sunday or holiday, the appropriate customs officer shall assign sufficient customs officers ... if available to perform any such services.... but only if the person requesting such services ... gives a bond.... Nothing in this section shall be construed to impair the existing authority of the Treasury Department to assign customs officers or employees to regular tours of duty at nights or on Sundays or holidays when such assignments are in the public interest....
 
 
 62
 Id. Therefore, unless the public interest dictates otherwise, the Customs Service may not even assign workers to perform overtime services until a vessel owner properly requests and complies with the licensing and bonding requirements. As the Claims Court found, no vessel captain or owner made a request, let alone gave a bond or obtained a special license. Therefore, the Customs Service was never authorized to assign any inspectors to perform 1911 Act services.
 
 
 63
 The majority relies upon the language in section 267 providing extra compensation when the workers report to duty, regardless of whether actual unlading takes place. This language merely underscores that the Customs Service only assigns workers to report for duty after the vessel captain has requested and posted a bond for "overtime services." The Claims Court correctly discerned that no vessel captain or owner ever made a request.
 
 
 64
 The majority nonetheless finds that the vessel captains may have "impliedly" requested inspections. The majority disregards the absence of a bond, the absence of a special license, and the absence of assignment to perform "overtime services." Even so, the first answer to the majority is that the 1911 Act, the Customs regulations, and section 1451 do not permit vessels to make an implied request or to file an implied bond or to obtain an implied license. Nor may Customs workers be impliedly assigned to overtime duties under the 1911 Act.[1]
 
 
 65
 Moreover, the majority suggests that the Mariel boat captains made implied requests for inspections by illegally entering United States waters. Lawbreakers do not generally request detection by implication or otherwise. These boat captains entered United States waters in the dead of night. Their vessels were crammed with illegal aliens. These captains were not requesting inspection, but avoiding detection.
 
 III.
 
 66
 The purpose of the 1911 Act reveals the reason for its detailed requirements. Congress enacted the 1911 Act to provide convenient after-hours inspections to commercial carriers who were in a hurry and willing to pay to get immediate inspections. Congressman Moore, a sponsor of the 1911 Act, explained this purpose:
 
 
 67
 There is no provision for the quick lading or unlading of tramp steamers.... Much of this commerce [iron ore] is brought by tramp steamers, and they desire to get away quickly, but they are held up through the usual regulations.... [I] think the mind of the committee should be disabused of the fact that the Government would be financially affected by the passage of this proposed law. The owner of the vessel pays for this extra work. He is perfectly willing to pay for the extra work.... The owner of a vessel comes in and wants to get away, and he asks the privilege of unlading at night....
 
 
 68
 Hearings on H.R. 9525 Before the House Committee on Ways and Means, 61st Cong., 2d Sess. 461, 462 (May 5, 1910); see also, id. at 470.
 
 
 69
 The 1911 Act gave carriers an option to speed up unlading by requesting and paying for after-hours Customs services. This purpose--to provide quick port turnarounds for commercial carriers--hardly encompasses policing an influx of illegal aliens.
 
 IV.
 
 70
 The Supreme Court emphasized these requirements of the 1911 Act in United States v. Myers, 320 U.S. 561, 566, 64 S.Ct. 337, 341, 88 L.Ed. 312 (1944) (footnotes omitted):
 
 
 71
 A carrier may procure customs service at night only by special license, and the statutes say the extra compensation shall be paid "by the licensee"....
 
 
 72
 The legislative history shows that the proponents of extra compensation constantly made the point that the Government would not be out of pocket by the legislation.
 
 
 73
 While Myers held that the 1911 Act "create[d] an obligation on the part of the United States to pay to inspectors such sums as they may earn under their provisions," id. at 567, 64 S.Ct. at 341, the Court based this holding on the Government's authority to issue special licenses upon request and collect reimbursements from the carriers.[2] In other words, the Government has an obligation to pay Customs workers for 1911 Act services because only the Government, as the Act directs, can recover the costs of those services from boat owners.
 
 
 74
 Myers dealt with inspections of traffic across the U.S.-Canadian border. As soon as Myers issued, the Customs Service began to collect the inspection fees at the borders. These Customs collections, however, jeopardized border traffic. When drafting legislation to correct the border problems caused by the Myers decision, the Senate Finance Committee in 1944 noted:
 
 
 75
 The result of the Myers decision was ... that [Customs inspection] service could be provided only upon the specific request of the operators of such facilities and conditioned upon furnishing of bond by them for reimbursement to the United States of extra compensation payable to customs officers and employees assigned to such duty.
 
 
 76
 S.Rep. No. 858, 78th Cong., 2d Sess. 1 (1944). As the Court of Claims explained, the bridges and tunnels "threatened to close on Sundays and holidays if the [1911] law [requiring payment] was enforced." O'Rourke v. United States, 109 Ct.Cl. 33, 42 (1947).
 
 
 77
 Congress intervened. Within a few weeks, Congress amended section 1451 to alleviate the threat. After the provisions of section 1451 requiring a request, a bond, a license, and assignment of Customs' workers, Congress added:
 
 
 78
 Provided, That the provisions of this section [that] require payment of compensation by the ... owner ... of a vessel or conveyance shall not apply to ... a highway vehicle, bridge, tunnel, or ferry, between the United States and Canada or between the United States and Mexico....
 
 
 79
 19 U.S.C. § 1451. This proviso expressly excused the Customs Service from seeking payment at both U.S. land borders. Border traffic could flow again. Congress expressly adopted the Myers rule (requiring the Government to pay 1911 Act overtime if not collected from a traveller) for both U.S. land borders.
 
 
 80
 To prevent any misunderstanding, the proviso further stated that the Customs Service "shall assign customs officers and employees to duty at such times during the twenty-four hours of each day ... to facilitate the inspection." Id. This language was necessary because section 1451 stated that the Service would only assign workers after satisfaction of the Act's request and licensing requirements. The 1944 Amendment clarified that the Service may assign workers at these borders without collecting overtime pay from travellers.
 
 Finally the 1944 Amendment stated:
 
 81
 Officers and employees assigned to such duty at night or on Sunday or a holiday shall be paid compensation in accordance with existing law as interpreted by the United States Supreme Court in the case of the United States v. Howard C. Myers, (320 U.S. 561 [64 S.Ct. 337, 88 L.Ed. 312]....
 
 
 82
 Id. The Act codified Myers for Customs workers at U.S. land borders. The Act required the Government to assign inspectors on the Canadian and Mexican borders and pay them extra overtime regardless of whether it received a request, bond, or repayment from travellers.
 
 
 83
 As noted by the majority, the committee report shows that Congress adopted Myers as the rule governing payment of Customs workers at the Canadian and Mexican borders. The language, intent, and legislative history of the 1944 Amendment show that Congress tried to correct the difficulties in the wake of Myers by limiting the case to U.S. land borders. See also, O'Rourke, 109 Ct.Cl. at 42.
 
 
 84
 The section 1451 proviso expressly mentions Myers. Rarely does Congress ever refer to a court case by name in a statute. Congress thus made clear that its enactment responded to the Myers situation. The 1944 Amendment's response, by its unambiguous terms, authorized 1911 Act pay for Customs workers on the Canadian and Mexican borders without prior requests, bonds, or licenses. For all other circumstances section 1451 continued to require requests, bonds, licenses, and assignment before the award of extra compensation.
 
 
 85
 The majority suggests that O'Rourke shows that Myers eliminated the request, bond, licensing, and assignment requirements even after the limitations of the 1944 Amendment. In the first place, Myers did not eliminate these legal requirements, but expressly based the Government's duty to pay workers on its ability to seek payment from licensees. Moreover, O'Rourke--like Congress--specifically limited Myers to "customs employees at ports served by the various kinds of toll facilities, bridges, tunnels, ferries, etc. such as are found in Detroit." Id. at 43. Most important, however, O'Rourke concerned solely services performed on the Canadian border. O'Rourke, 109 Ct.Cl. at 36. Therefore, the Court of Claims decided the case under the section 1451 proviso. Id. at 44-46. Because section 1451's proviso required the Government to pay inspectors at U.S. land borders even without reimbursement, the Court of Claims awarded extra compensation to the Customs inspector on the Canadian border. Id. at 51. Brown v. United States, 109 Ct.Cl. 52 (1947) and Ostroot v. United States, 109 Ct.Cl. 57 (1947) also applied the 1944 Amendment to workers on the Canadian border.
 
 
 86
 This case, however, does not involve a "highway vehicle, bridge, tunnel, or ferry" and has nothing to do with the Canadian or Mexican borders. Congress expressly adopted the Myers exception for those situations and those alone. This case involves sea vessels from Cuba arriving in Florida. Because this case does not fall within the terms of the 1944 proviso to section 1451, the rest of section 1451 applies. In other words, a Customs worker only qualifies for "extra compensation" after assigned by the Service to inspect a vessel complying with the request, bond, and license requirements.
 
 
 87
 The majority does not show that the Customs workers on the Mariel interdiction were assigned to duties under the 1911 Act. The majority does not show requests, bonds, licenses, or assignments. Instead the majority finds implied requests for inspections of merchant cargo in the midnight seizure of refugee smugglers.
 
 V.
 
 88
 The majority states too little and assumes too much. The majority assumes that the 1911 Act, which expressly refers to checking cargo and baggage, covers a search and seizure operation. It assumes that human refugees are cargo. It assumes that searches and arrests are unlading of cargo. It assumes that midnight evasion tactics are implied requests for commercial inspections. It assumes that the requests, bonds, and special licenses required by sections 1451, 261 and 267 are unnecessary. It assumes the Customs Service assigned these workers to 1911 Act duties. It assumes that the 1944 Amendment--enacted to eliminate the need for payments at U.S. land borders--does not say what it says.
 
 
 89
 The provisions of the 1911 Act do not entitle appellants to additional overtime pay in this case. The Customs employees did not perform services within the meaning of the 1911 Act. Congress wrote the 1911 Act to benefit carriers seeking after-hours processing of normal commercial cargo. The operation to seize illegal alien traffickers did not include any 1911 Act services. The Claims Court correctly granted summary judgment for the Government. For these reasons, I respectfully dissent.
 
 
 
 [1]
 Section 261 provides that:
 Customs officers acting as boarding officers shall be allowed extra compensation for services in boarding vessels at night or on Sundays or holidays--at the rate prescribed by the Secretary of the Treasury as provided in section 267 of this title, the said extra compensation to be paid by the master, owner, agent, or consignee of such vessels.
 Section 267 provides, in pertinent part:
 The Secretary of the Treasury shall fix a reasonable rate of extra compensation for overtime services of customs officers and employees who may be required to remain on duty between the hours of five o'clock postmeridian and eight o'clock antemeridian, or on Sundays or holidays, to perform services in connection with the lading or unlading of cargo, ... or in connection with the unlading, receiving, or examination of passengers' baggage.... The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted.... Such extra compensation shall be paid if such officers or employees have been ordered to report for duty and have so reported, whether the actual lading, unlading, receiving, delivery, or examination takes place or not.
 
 
 [1]
 19 C.F.R. § 24.16(c)(2) (1980) does not alter the request, assignment, and bond requirements for "pleasure vessels or private aircraft." The regulation states: "In each such case the assignment to perform services shall be conditional upon the receipt of the appropriate application and security." Id. In addition, this pleasure vessel procedure--the procedure is limited to "pleasure," not private, vessels--hardly applies to the Mariel boatlift. Moreover, the record contains no evidence that the detailed receipting procedures of 19 C.F.R. § 24.16(c)(2) were used during the interdiction
 
 
 [2]
 Contrary to the majority's view, United States v. Myers, 320 U.S. 561, 64 S.Ct. 337, 88 L.Ed. 312 (1944), does not suggest that a boat captain need not request services to trigger 1911 Act pay. In Myers, as the Claims Court noted in this case, the Supreme Court expressly upheld the 1911 Act requirement for a bond and a license before after-hours unlading of cargo. Myers, 320 U.S. at 561, 566-67, 64 S.Ct. at 341. A carrier obtains a license by making a request and posting a bond. Furthermore, the Court of Claims stated expressly that the carriers inspected in Myers received a permit "on application for the service desired." Myers v. United States, 99 Ct.Cl. 158, 163 (1943). The Myers case does not support the notion that carriers may make an implied request for 1911 Act inspections, let alone for searches and seizures to detect illegal activity